First Division
January 22, 2007

No. 1-04-2674

| | | |
|---|---|---|
| EDWARD PESTKA and BETTY L. PESTKA, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiffs-Appellants, | ) | of Cook County |
| | ) | |
| v. | ) | |
| | ) | |
| TOWN OF FORT SHERIDAN COMPANY, L.L.C., an | ) | |
| Illinois Corporation, TOWN OF FORT SHERIDAN | ) | |
| OPERATING COMPANY, L.L.C., WOLF | ) | |
| MANAGEMENT SERVICES, INC., | ) | |
| ENVIRONMENTAL QUALITY MANAGEMENT, | ) | 02 L 11906 |
| INC., and PEARSON, BROWN AND ASSOCIATES, | ) | |
| INC., | ) | |
| | ) | |
| Defendants-Appellees | ) | |
| | ) | |
| (Midwest Rail and Dismantling, Inc., a Foreign | ) | |
| Corporation Doing Business in Illinois, | ) | Honorable |
| | ) | William Maddux, |
| Defendant). | ) | Judge Presiding. |

PRESIDING JUSTICE McBRIDE delivered the opinion of the court:

Appellants Edward and Betty Pestka (the Pestkas) brought a construction negligence action against Town of Fort Sheridan Company, L.L.C. (TFSC), and Midwest Rail and Dismantling, Inc. (Midwest), seeking damages for injuries sustained on the job by Edward, a truck driver, and for Betty's loss of consortium. The Pestkas later filed an amended complaint in which they added Town of Fort Sheridan Operating Company, L.L.C. (TFSOC), Wolf Management Services, Inc. (Wolf), Environmental Quality Management, Inc. (Environmental), and Pearson, Brown & Associates, Inc. (Pearson), as additional defendants. The trial court dismissed the additional defendants with prejudice because the Pestkas failed to seek leave of court before filing

their amended complaint. The trial court further granted TFSC's motion for summary judgment. The Pestkas later settled with Midwest. The Pestkas appeal the trial court's dismissal of TFSOC and the granting of TFSC's motion for summary judgment. For the reasons that follow, we affirm.

The Pestkas contend that (1) the trial court erred when it dismissed their first amended complaint against TFSOC, and (2) that the trial court erred when it granted TFSC's motion for summary judgment.

TFSOC was formed as a limited liability company on July 24, 1996, and was managed by TFSC. TFSOC owned a property known as Fort Sheridan. On March 24, 1998, TFSOC, by TFSC as the duly authorized manager of TFSOC, entered into a demolition service agreement with Midwest that was to be performed at Fort Sheridan. Midwest then subcontracted with Miller Compressing Company, which in turn subcontracted with Recycler's Transport, Inc. (Transport), to perform haulage during the demolition phase of the project.

On May 22, 1998, Edward Pestka was employed by Transport as a truck driver and was working at Fort Sheridan. Edward had worked part time for Transport since 1995 and was at Fort Sheridan to haul away debris from the demolition. He had been trained to stay 100 feet away from the truck when it was being loaded in case the crane operator dropped a load.

The jobsite supervisor on May 22 was Mark Augustine, who had 25 years of experience operating construction cranes. On May 22, 1998, Augustine was operating the crane at Fort Sheridan, because the normal crane operator did not show up for work. Although Augustine had not operated this particular model of crane before, he had experience operating cranes with

2

controls similar to those on the crane at Fort Sheridan.

On May 22, Augustine began loading Edward's truck. At one point, a steel I-beam Augustine attempted to load fell over the edge of the trailer. The beam struck Edward in the back. As a result of the accident, Edward was severely injured and had his right leg amputated below the knee.

On May 4, 1999, the Pestkas filed a complaint against TFSC and Midwest, alleging construction negligence and loss of consortium. The Pestkas alleged that TFSC owned and/or was in charge of erecting, construction, altering, removing, and/or painting a certain building at Fort Sheridan. Further, the Pestkas alleged that TFSC failed to properly inspect and manage the premises, provide Edward with a safe place to work or adequate safeguards, supervise the work, operate the crane, or provide equipment or personnel. As a result, Edward was seriously injured, and Mrs. Pestka lost his society, companionship and consortium. The Pestkas made similar allegations against Midwest.

On March 29, 2002, without leave of court, the Pestkas filed a first amended complaint and added TFSOC, Wolf, Environmental, and Pearson as defendants, and alleged similar construction negligence and loss of consortium claims as were alleged against TFSC and Midwest. On May 6, 2002, a summons was issued for TFSOC, and TFSOC filed an appearance on May 22, 2002. Also, on May 22, 2002, the trial court entered an order on TFSOC's motion vacating any and all defaults entered against TFSOC. TFSOC never filed an answer in this lawsuit.

The newly added defendants (including TFSOC) moved to dismiss the first amended

complaint on the grounds that the Pestkas had not obtained leave of court to file it. In July 2002, the Pestkas sought leave to file the first amended complaint *nunc pro tunc* March 29, 2002. TFSOC and the other newly added defendants filed briefs opposing the Pestkas' motion. On August 28, 2000, the trial court dismissed the first amended complaint as to the new defendants and denied the Pestkas' motion for leave to file the first amended complaint *nunc pro tunc*.

On September 24, 2002, the Pestkas obtained leave to file its first amended complaint, and on October 10, 2002, the Pestkas obtained leave to amend the September 24, 2002, order and add and identify additional defendants. Again, Wolf, Environmental, Pearson and TFSOC moved to dismiss the first amended complaint and asserted that it was barred by the construction statute of limitations. On January 3, 2003, the trial court entered an order granting the motions to dismiss and included a finding pursuant to Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)) that there was "no just reason to delay enforcement or appeal of this order." Although TFSOC had moved for dismissal, the January 3, 2003, order listed TFSC, and not TFSOC, as one of the moving parties. In that order, the trial court dismissed Wolf, Pearson, Environmental and TFSC. The claims against those defendants were dismissed with prejudice, and the trial court included Rule 304(a) language in the January 3, 2003, order. On January 15, 2003, TFSOC filed a motion to correct the record *nunc pro tunc* to reflect that TFSOC should have been the dismissed defendant in the January 3, 2003, order. On January 24, 2003, the trial court granted TFSOC's motion and entered an order that read in its entirety:

> "This cause coming to be heard on the motion of defendant
>
> TFS Operating Co., LLC to correct the record to reflect a

> dismissal, with prejudice, as to TFS Operating Co. LLC, *nunc pro*
>
> *tunc*, due notice having been given and the court being fully advised
>
> in the premises, it is hereby ordered:
>
>> Defendant TFS Operating Co., LLC's motion to correct the
>>
>> record to reflect a dismissal, with prejudice, as to TFS Operating
>>
>> Co. LLC, *nunc pro tunc*, is hereby granted, *nunc pro tunc* to 1-3-
>>
>> 03."

The record does not contain a transcript of the proceedings from January 3, 2003, or January 24, 2003.

In his deposition, Edward said that on the day of the accident, Mark Augustine, Midwest's project superintendent, was operating the crane because the normal crane operator failed to show up. Augustine, the only person Edward received instructions from while he was working on the job, told Edward where to park his truck to get loaded. Before Edward had a chance to exit the cab of his truck, Augustine had begun dropping beams in Edward's trailer. Edward quickly exited his cab and began walking away from his truck. Edward testified that as he was walking away from his truck, he was hit in the back by an I-beam. He estimated that the entire incident lasted only a few minutes.

Mark Augustine testified in his deposition that he had scheduling authority for the subcontractors. It was his understanding that the general contractor for the Fort Sheridan job was a company called Red Seal, and Joe Vassau was Red Seal's project manager. Augustine received instructions from Vassau regarding what building needed to be demolished and by when, but

Vassau never told Augustine how to work. Augustine further believed Mike Tracy to be a "big shot" with Town of Fort Sheridan. On one occasion, Tracy advised him that Midwest had not removed enough dirt from some concrete it had been crushing for a recycling project. On the date of the accident, the normal crane operator did not show up for work. As a result, Augustine operated the crane and loaded Edward's truck. Augustine stated that when he started loading the beams into Edward's trailer, Edward had already exited and walked away from the cab but he was not sure how far away from the truck Edward had gotten. Augustine then proceeded to load five beams into the trailer. The sixth beam that Augustine attempted to load was bent in the middle, taking the shape similar to that of a boomerang. As a result of the bent shape of the beam, it was not going into the trailer very easily. Each end of the beam ended up sitting kitty corner from the other on opposite side walls of the trailer. When this happened, Augustine attempted to tap one end of the beam off the side of the trailer, which he said is common practice, so that the beam would pivot and fall into the trailer. Unfortunately, when he tapped the beam it did not go into the trailer. Instead, the beam rolled over the outside edge of the trailer, on the opposite side from where Augustine was loading. When that happened, Augustine went and got another beam, thinking he would get the fallen beam when he was done loading the trailer. A few minutes later, some of the laborers on the job told him that "somebody got hurt." Augustine and another crane operator got to Edward at about the same time. The beam was still lying on Edward, and Augustine and the other crane operator got it off of Edward. Augustine estimated that from the time Edward exited his truck until the time of the accident, no more than five minutes had elapsed. Augustine further testified that due to the high-walled construction of the trailers,

6

spotters are not typically used. The only place for a spotter to be located would be on top of the cab of the truck, and when working with steel beams, that would be too dangerous.

J. Michael Tracy, TFSC's chief corporate officer, testified in his deposition that TFSC managed and provided oversight for the redevelopment project at Fort Sheridan. Mr. Vassau and Mr. Larsen, both employees of Red Seal (a member of TFSOC) and construction supervisors on the project, had authority to observe the Fort Sheridan work site and stop the work of the contractors. He further testified that the responsibility of safety belonged to the contractors, but if he, Larsen, or Vassau knew of a situation that was life-threatening, he would intervene. Larsen and Vassau were responsible for inspecting Midwest's work and the work of others to make sure it was done pursuant to the terms of the contract. TFSC conducted weekly meetings with its subcontractors during which the subcontractors could bring up issues that were of concern to them, safety or otherwise. Tracy occasionally observed Augustine operating machinery at the jobsite. Tracy did not have any complaints regarding Augustine's work. Tracy was not on the jobsite when the accident occurred. He first learned of the accident from either Larsen or Vassau after he returned to the jobsite around lunchtime that day. Tracy had no knowledge regarding whether it is considered an unsafe work practice for someone to load beams into a truck with the driver in the proximity of the truck.

On February 27, 2003, TFSC filed its answer to the Pestkas' first amended complaint in which it denied all material allegations and raised the affirmative defense of comparative negligence. On March 24, 2003, TFSC filed a motion for summary judgment alleging that it did not own the premises, that it was not in charge of the construction project, and that it had no

authority to stop work. On October 15, 2003, TFSC filed an alternative motion for summary judgment in which it argued that it could not be held liable because it did not retain control over the operative details of Edward's work. Specifically, TSFC asserted that it did not contractually owe a duty to Edward, nor did it owe a duty by virtue of its (TFSC's) conduct.

In opposing TFSC's first motion for summary judgment, the Pestkas argued that TFSC was not at the jobsite simply as a manager of TFSOC. Rather, they asserted, in part, that TFSC conducted weekly safety meetings, managed and provided oversight for the redevelopment of Fort Sheridan, was an equity participant in the project, and that TFSC and TFSOC were essentially the same company. In opposing TFSC's alternative motion for summary judgment, the Pestkas argued that Larsen and Vassau were present at the project site on a daily basis and had authority to observe the work site and make sure the work was performed in accordance with the project plans and specifications. The Pestkas further alleged that these men had the authority to stop work and could remove any worker they deemed unqualified. Further, Tracy had day-to-day on-site responsibilities regarding the demolition, including the ability to personally stop work for safety violations.

On December 17, 2003, the trial court heard argument on TFSC's first motion for summary judgment and took it under advisement. On January 23, 2004, the trial court heard argument on TFSC's alternative motion for summary judgment and granted it, finding that there was no genuine issue of fact regarding whether TFSC retained sufficient control to impose liability under section 414 of the Restatement of Torts (Second). Restatement (Second) of Torts § 414 (1965). Further, the trial court denied TFSC's oral motion for Rule 304(a) language, and

8

the original motion for summary judgment was considered moot. The case continued on as to Midwest.

On July 21, 2004, the Pestkas settled with Midwest and the case was dismissed. On July 26, 2004, the Pestkas moved to vacate the settlement because Transport did not agree to compromise its lien as the Pestkas previously thought had been agreed. On August 16, 2004, the trial court denied the Pestkas' motion to vacate and included Rule 304(a) language in the dismissal. The Pestkas filed a notice of appeal on August 19, 2004.

The Pestkas first contend that the trial court erred when it dismissed their first amended complaint against TFSOC.

The Pestkas acknowledge that they failed to obtain leave of court before they filed their first amended complaint adding Wolf, Environmental, Pearson and TFSOC as parties to the lawsuit, but they argue that the trial court's dismissal was unjustified and represented an improper elevation of form over substance. The Pestkas also contend that TFSOC was not prejudiced. In fact, the newly added defendants were on notice prior to the expiration of the statute of limitations that the Pestkas intended to add them as parties to the lawsuit. Further, the amended complaint would have been allowed if the Pestkas had sought leave of court when they first filed the amended complaint instead of erroneously filing the amended complaint "over the counter." Finally, the Pestkas contend that the trial court should allow amendments on just and reasonable terms and that resolution of cases should be on the merits.

Appellee TFSOC, however, contends that this court lacks jurisdiction to consider this issue because the trial court entered a final order dismissing Wolf, Environmental, Pearson and

TFSOC on January 3, 2003, and the Pestkas did not file their notice of appeal against TFSOC until August 19, 2004, well after 30 days from January 3, 2003. Further, the Pestkas were not prejudiced in any manner by the January 24, 2003, order because the Pestkas still had over a week to file a notice of appeal from the January 3, 2003, order and could have sought an extension of time to file a notice of appeal as well. Alternatively, TFSOC contends that although courts may liberally allow amendments to the pleadings, the dismissal was proper because the requirement to obtain leave of court before adding a new party has been strictly enforced. Therefore, the Pestkas' failure to obtain leave of court before amending their complaint to add four new defendants was fatal.

We begin by addressing whether this court has jurisdiction to consider this issue. A reviewing court is obliged to examine its jurisdiction and to dismiss an appeal if it determines that it lacks the requisite jurisdiction. *Shanklin v. Hutzler*, 277 Ill. App. 3d 94, 99 (1995).

Supreme Court Rule 304(a) states that "an appeal may be taken from a final judgment as to one or more but fewer than all of the parties or claims only if the trial court has made an express written finding that there is no just reason for delaying either enforcement or appeal or both." 155 Ill. 2d R. 304 (a); *Shanklin*, 277 Ill. App. 3d at 99. Absent such a finding, any judgment that adjudicates the rights and liabilities of fewer than all the parties is not appealable. *Shanklin*, 277 Ill. App. 3d at 99.

Here, the January 3, 2003, order reads in relevant part:

> "[I]t is ordered, as follows: The motions to dismiss of 1.)
>
> defendant, Wolf Management Services, Inc., ii.) defendant, Pearson

> Brown & Associates, Inc., iii.) defendant, Environmental Quality
>
> Management, Inc., and iv.) defendant, Town Of Fort Sheridan
>
> Company, LLC, are GRANTED. Plaintiff's claims against those
>
> defendants are dismissed with prejudice. Pursuant to Rule 304(a),
>
> Illinois Supreme Court Rules, the court finds no just reason to delay
>
> enforcement or appeal of this order."

There is no dispute that TFSC was erroneously listed as a party being dismissed instead of TFSOC, the correct party being dismissed. It is unclear from the record whether the January 3, 2003, order was drafted by one of the moving parties or by the trial court. Regardless of how the error occurred, TFSOC was not listed in on the January 3, 2003, order as being a dismissed party. As a result, TFSOC filed a motion in which it asked the trial court to enter an order correcting the record to reflect a dismissal, with prejudice, as to TFSOC *nunc pro tunc*, but it did not request that the correction contain Rule 304(a) language. On January 24, 2003, the trial court granted TFSOC's motion and entered an order that reads, in part, "defendant TFS Operating Co., LLC's Motion to Correct the record to reflect a dismissal, with prejudice, as to TFS Operating Co. LLC, nunc pro tunc, is hereby granted, nunc pro tunc, to 1-3-03." The January 24, 2003, order did not contain Rule 304(a) language. TFSOC asked that the correction be made to reflect a dismissal with prejudice, but did not ask the trial court to include Rule 304(a) language in the January 24, 2003, order.

In the present case, TFSOC argues that the January 24, 2003, order incorporates the Rule 304(a) language of the January 3, 2003, order simply by being a *nunc pro tunc* order, and

therefore, the notice of appeal had to be filed within 30 days of the January 3 order. The Pestkas, on the other hand, argue that the January 24, 2003, order dismissed TFSOC, but was interlocutory and not appealable because the January 24 order did not contain Rule 304(a) language. Both parties cite *Kooyenga v. Hertz Equipment Rentals, Inc.*, 79 Ill. App. 3d 1051 (1979), in support of their positions.

In *Kooyenga*, the appellate court considered whether it had jurisdiction over an appeal from a *nunc pro tunc* order entered by the trial court. Specifically, the appellate court was concerned with whether the time for Febel, the appellant, to file an appeal started running after the entry of the *nunc pro tunc* order or whether the appeal should have been filed after the entry of judgment following a jury trial.

In that case, Kooyenga, an employee of subcontractor Febel, sued Leahy, the general contractor and property owner, to recover damages for injuries Kooyenga suffered when he fell from a scaffold. Leahy, the general contractor, filed a third-party complaint against Febel, the subcontractor and Kooyenga's employer. In December 1976, a jury trial was held in which the jury returned a verdict in favor of Kooyenga against Leahy in the amount of $1,578,000 and a verdict in favor of Leahy against Febel entitling Leahy to reimbursement from Febel. The clerk's office record book recited both verdicts rendered by the jury, along with the judgment rendered against Leahy in favor of Kooyenga for $1,578,000. The judgment corresponding to the verdict against Febel in favor of Leahy was not recorded in the record book. In January 1977, Febel filed a posttrial motion and alleged, in part, that the jury verdicts against Leahy and Febel were incorrect. In May 1977, the trial court denied all posttrial motions.

1-04-2674

In April 1978, Leahy filed a motion requesting the trial court to enter judgment *nunc pro tunc* as of December 1976 on the jury verdict in favor of Leahy against Febel. In support of the motion, Leahy argued that the clerk of the court inadvertently failed to enter judgment in favor of Leahy against Febel; that all parties understood the verdict and acted accordingly; and that Febel was informed in a letter by his insurer that the time for filing a notice of appeal would expire in June 1977. Febel argued that the judgment in favor of Leahy against Febel could not be entered until Leahy made some payment to Kooyenga, because without such payment, there was no basis for reimbursement and Febel's obligation to indemnify Leahy existed only as a contingent debt. The trial court found that the clerk's office inadvertently failed to enter the judgment and granted Leahy's motion *nunc pro tunc*. Febel appealed from that judgment.

On appeal, Febel challenged the propriety of the entry of judgment *nunc pro tunc*. Specifically, Febel contended that there was no evidence in the record disclosing that the trial court directed entry of judgment on the verdict returned in favor of Leahy against Febel, and that the failure to enter a judgment was a judicial omission, not a clerical error, and therefore, could not properly be entered *nunc pro tunc*. *Kooyenga*, 79 Ill. App. 3d at 1051.

A *nunc pro tunc* order is an entry now for something that was done on a previous date and is made to make the record speak now for what was actually done then. *Kooyenga*, 79 Ill. App. 3d at 1055. A court has inherent power to make an entry *nunc pro tunc* at any time, even after the expiration of its term, to correct a clerical error or matter of form so that the record reflects the actual order or judgment rendered by the court when such an entry is based upon a definite and certain record. *Kooyenga*, 79 Ill. App. 3d at 1055-56. Entry of a *nunc pro tunc*

13

judgment is always proper when a judgment has been ordered by the court, but the clerk failed or neglected to copy it into the record. *Kooyenga*, 79 Ill. App. 3d at 1056. However, before a *nunc pro tunc* entry may be made, it is necessary that there be evidence that a judgment was actually rendered. *Kooyenga*, 79 Ill. App. 3d at 1056.

In resolving this issue, the appellate court examined the record to determine whether the record indicated with sufficient clarity that at the conclusion of the trial a judgment on the verdict in favor of Leahy against Febel was rendered. The appellate court examined the trial court record and noted that at the conclusion of the trial, two jury verdicts were returned, the verdicts were read in open court, and the jury was polled. According to the appellate court, the fact that judgment was entered on one of the verdicts shows that the trial court acted by giving the clerk some direction, and there was no plausible reason why judgment would not have been rendered on the other verdict. Further, subsequent to the time the verdicts were returned and judgment was entered on at least one of the verdicts, the parties acted as if judgment had been rendered on both verdicts. In fact, Febel timely filed a posttrial motion contesting the verdicts against both itself and Leahy. Febel even filed a supplemental post-trial motion which sought relief " 'supplemental to verdict and judgment.' " *Kooyenga*, 79 Ill. App. 3d at 1057. The appellate court also observed that the trial court denied the posttrial motions and set an appeal bond, which would not have been necessary had Febel believed judgment had not been entered against it in the same amount that was rendered against Leahy. Accordingly, the *Kooyenga* court found the record to be "crystal clear that Febel thought and acted as if judgment was entered against him on January 3, 1977. Using the clerk's failure to record the judgment [was] an obvious attempt to

delay and defer Febel's obligation." *Kooyenga*, 79 Ill. App. 3d at 1057. As a result, the appellate court found that the time to appeal began running in May 1977, and Febel failed to file a notice of appeal within 30 days from the denial of the posttrial motions in May 1977.

Pointing out that it would exercise all proper means to preserve a party's valuable right to appeal, the *Kooyenga* court noted that to do so in that case would allow appellant to "take advantage of a clerical error as a means for perfecting an appeal from a judgment it had previously made a conscious determination not to appeal." *Kooyenga*, 79 Ill. App. 3d at 1059. The court further reasoned that such a ruling would "violate the spirit of Rule 303(a) which contemplates the prompt and orderly prosecution of an appeal." *Kooyenga*, 79 Ill. App. 3d at 1059-60. As a result, the court held that appellant waived its right to appeal and should not get a "second chance" to appeal. *Kooyenga*, 79 Ill. App. 3d at 1060.

We conclude the instant case is distinguishable from *Kooyenga*. While *Kooyenga* involved a nunc *pro tunc* order on a jury verdict, this case involves the absence of Rule 304(a) language in a *nunc pro tunc* order relating back to an order on a motion to dismiss that contained Rule 304(a) language.

We find the absence of Rule 304(a) language is dispositive of the issue of our jurisdiction. Absent Rule 304(a) language, the January 24, 2003, order was not appealable as to TFSOC. *Shanklin*, 277 Ill. App. 3d at 99 (a dismissal order that adjudicates the rights and liabilities of fewer than all parties is not appealable absent Rule 304(a) language). Thus, any notice of appeal at that time would have been premature because the judgment did not dispose of all parties and did not contain Rule 304(a) language. As of January 24, 2003, the Pestkas still had claims

pending against TFSC and Midwest. We conclude that the deadline for the Pestkas to appeal the January 24, 2003, order was 30 days after the settlement with Midwest became final. That date was August 16, 2004. This is so because all claims were finally disposed of on August 16, 2004. Because the Pestkas timely filed their notice of appeal on August 19, 2004, we have jurisdiction to consider this appeal as it pertains to TFSOC. Having already determined that Rule 304(a) language was required in the January, 24, 2003, order, we do not need to consider TFSOC's argument that the Pestkas had over a week available to file a notice of appeal from the January 3, 2003, order and/or that the Pestkas could have sought an extension of time to file an appeal.

Having determined that we have jurisdiction, we now consider whether the trial court properly dismissed TFSOC. A party must first obtain leave of court before it can amend a complaint to add a claim against a new party. *Stichauf v. Cermak Road Realty*, 236 Ill. App. 3d 557, 564 (1992). In other words, an amended complaint that adds additional parties and is filed without leave of court is a nullity. *Stichauf*, 236 Ill. App. 3d at 564. "A court does not have jurisdiction over a party where leave is not granted to amend the complaint to add that party." *Stichauf*, 236 Ill. App. 3d at 564.

In the present case, the Pestkas filed their original complaint on May 4, 1999. Then without obtaining leave of court, the Pestkas filed a first amended complaint on March 29, 2002, which added four additional defendants. The newly added defendants moved to dismiss the first amended complaint on the ground that the Pestkas did not first obtain leave of court to file the amended complaint. In July 2002, the Pestkas sought leave to file the first amended complaint, *nunc pro tunc*, to March 29, 2002. The newly added defendants filed briefs opposing the Pestkas'

motion. On August 28, 2002, the trial court dismissed the first amended complaint as to the new defendants and denied the Pestkas' motion for leave to file the first amended complaint, *nunc pro tunc*. On September 24, 2002, the Pestkas obtained leave to file their first amended complaint, and on October 10, 2002, the Pestkas obtained leave to amend the September 24, 2002, order to add and identify additional defendants. The newly added defendants again filed motions to dismiss, but this time it was based upon the expiration of the statute of limitations on May 22, 2002. On January 3, 2003, the trial court granted the defendants' motions to dismiss and included Rule 304(a) language in the dismissal order.

In *Stichauf v. Cermak Road Realty*, 236 Ill. App. 3d 557 (1992), this court considered whether it had jurisdiction over an appeal as to defendants who were added as parties without the plaintiff first obtaining leave of court. In *Stichauf*, the plaintiff filed a complaint for fraudulent misrepresentation and legal malpractice on December 22, 1986, naming four defendants, including Cermak Road Realty. On April 2, 1987, the trial court granted Cermak Road Realty's motion to strike for failure to state a cause of action and gave plaintiff 28 days to file an amended complaint based on Cermak's motion. On April 8, 1987, plaintiff filed an amended five-count complaint, which added four additional defendants–including three individuals employed by Cermak Road Realty. Plaintiff had not received leave to add new parties, and the newly added defendants did not object to having been added to the complaint. Cermak Road Realty and the three individuals employed by Cermak were collectively referred to as the Cermak defendants. On September 14, 1988, the trial court granted the Cermak defendants' motion to strike counts I and II of the amended complaint and gave plaintiff leave to file a second amended complaint, which was filed

on November 16, 1988. On May 24, 1989, the trial court granted the Cermak defendants' motion to strike and dismiss counts I and II of the second amended complaint. On appeal, the Cermak defendants moved to dismiss the appeal against them for lack of jurisdiction. The Cermak defendants alleged that plaintiff failed to file a timely notice of appeal, and alternatively, the newly added defendants argued that they were added through amendment without leave of court. The plaintiff argued that the failure of the newly added defendants to object to being added as a party to the lawsuit constituted waiver.

In dismissing the appeal as to the newly added defendants, the *Stichauf* court noted that the granting of leave to file an amended complaint extended only to the complaint filed against the defendant Cermak Road Realty. There was nothing in the record to indicate that plaintiff either requested or received leave to add additional parties. The record contained no motion for leave to add additional parties. Further, there was no order that granted plaintiff leave to add additional defendants.

Addressing plaintiff's waiver argument, the *Stichauf* court looked at *Callaghan Paving, Inc. v. Keeneyville Construction Co.*, 197 Ill. App. 3d 937 (1990). In *Callaghan Paving*, the plaintiff was granted permission to amend its complaint against one defendant. When plaintiff filed its amended complaint, it added an additional defendant. The newly added defendant did not object to being added to the lawsuit. In fact, the new defendant " 'was served, appeared and participated in the litigation for more than two years.' " *Stichauf*, 236 Ill. App. 3d at 565-66, quoting *Callaghan Paving*, 197 Ill. App. 3d at 939. The *Callaghan Paving* court declined to find the newly added defendant's actions constituted waiver because the issue was jurisdictional and

could be raised at any time.

The instant case does not involve a waiver issue. Unlike the plaintiff in *Stichauf*, the Pestkas did not have leave to file an amended complaint, and certainly did not have leave to add new parties. The newly added defendants immediately sought dismissal on the ground that the Pestkas did not properly file their complaint against the new defendants until September 24, 2002, after the statute of limitations had expired (May 22, 2002.) Further, the newly added defendants' participation in the instant case was limited to being present at a few depositions. In addition, the Pestkas' argument that their amended complaint should have been allowed because the dismissed defendants were on notice of a suit before the expiration of the statute of limitations is not supported by any relevant authority. The Pestkas cite multiple cases for the proposition that amendments should be liberally allowed in the interest of justice. However, none of the cited cases deals with the addition of a new party. See *Siebert v. Continental Oil Co.*, 161 Ill. App. 3d 891 (1987) (amended complaint allowed to change theory of liability against a party already a defendant); *Evans v. United Bank*, 226 Ill. App. 3d 526 (1992) (complaint amended to include factual allegations); *Kupianen v. Graham*, 107 Ill. App. 3d 373 (1982) (amended complaint deleted request for punitive damages, thereby bringing damage request in line with statute under which action was brought); *Giacalone v. Chicago Park District*, 231 Ill. App. 3d 639 (1992) (amended complaint cured factual deficiencies of original complaint and added count); *Thomas v. Gouwens*, 25 Ill. App. 3d 663 (1975) (amended complaint included particulars of their claimed damages); *Banks v. United Insurance Company of America*, 28 Ill. App. 3d 60 (1975) (amended pleadings to allege additional defense). Accordingly, we find the trial court properly dismissed the

Pestkas' first amended complaint against TFSOC.

We next consider whether the trial court erred when it granted summary judgment in favor of TFSC. The Pestkas contend that TFSC controlled the Fort Sheridan work site and had authority to stop work if it saw unsafe practices taking place, and therefore, owed a duty to Edward to prevent injury. The Pestkas, specifically, contend TFSC acted as general contractor on the job, conducted weekly and monthly progress meetings, managed the project, and provided oversight for the entire project. TFSC contends that neither the contract nor its conduct created a duty to prevent Edward from injury.

The purpose of summary judgment is to determine whether a question of fact exists. *Martens v. MCL Construction Corp.*, 347 Ill. App. 3d 303, 312 (2004). It is appropriate only where the pleadings, depositions, admissions and affidavits show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. 735 ILCS 5/2-1005 (c) (West 2002); *Martens*, 347 Ill. App. 3d at 312. "However, where material facts are disputed, the trial court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences from the facts presented in favor of the nonmovant." *Martens*, 347 Ill. App. 3d at 312. Summary judgment should be allowed only when the right of the moving party is clear and free of doubt. *Martens*, 347 Ill. App. 3d at 312. We review the grant of summary judgment *de novo*. *Martens*, 347 Ill. App. 3d at 312.

The essential elements of a cause of action based on common-law negligence are the existence of a duty of owed by the defendant to the plaintiff, the breach of that duty, and the injury proximately caused by that breach. *Cochran v. George Sollitt Construction Co.*, 358 Ill.

App. 3d 865, 873 (2005). A duty of care arises where the parties stand in relationship to one another such that the law imposes upon defendant an obligation of reasonable conduct for the benefit of plaintiff. *Cochran*, 358 Ill. App. 3d at 873. Generally, one who employs an independent contractor is not liable for the acts or omissions of the independent contractor. *Martens*, 347 Ill. App. 3d at 313. This is because the principal generally does not supervise the details of the independent contractor's work and, as a result, is not in a good position to prevent negligent performance. *Martens*, 347 Ill. App. 3d at 313. On the other hand, the essence of employment is that the employee submits to the employer's right to monitor and direct the details of the work in exchange for wages. *Martens*, 347 Ill. App. 313-14.

Our decision in *Cochran v. George Sollitt Construction Co.* is instructive on this issue. *Cochran v. George Sollitt Construction Co.*, 358 Ill. App. 3d 865 (2005). In *Cochran*, we considered whether a motion for summary judgment was properly granted in favor of a general contractor in a construction negligence case. Specifically, in *Cochran*, plaintiff, a sheet metal worker, stood on a ladder which had been placed on a piece of plywood that itself had been placed on top of two milk crates. At one point, the ladder shifted to the edge of the plywood, causing the plywood to tip, and plaintiff fell to the floor and sustained injuries. Plaintiff sued the general contractor for negligence for failing to provide a safe place to work, proper support for plaintiff's protection, and properly manage, maintain, or control the premises, and the support equipment that was used.

We conducted an analysis of section 414 of the Restatement of Torts (Second) and noted that pursuant to the exceptions articulated in section 414, an employer of an independent

contractor may be subject to vicarious liability for the contractor's negligence if the employer retains control over the operative details of the contractor's work. If the employer does not retain control over the operative details, the employer may still be subject to direct liability when it contractually assumes supervisory duties on a construction project and fails to exercise those duties with reasonable care.

In *Cochran*, we first looked to whether the employer retained control over the operative details of the contractor's work. Comment *a* to section 414 explains that by retaining control over the subcontractor's work, the general contractor may be vicariously liable for the subcontractor's negligence. Restatement (Second) of Torts § 414, Comment *a* (1965). Alternatively, even in the absence of such control, the general contractor may be directly liable if it does not exercise its supervisory control with reasonable care. Analyzing *Moss v. Rowe Construction Co.*, 344 Ill. App. 3d 772 (2003), and *Martens v. MCL Construction Corp.*, 347 Ill. App. 3d 303 (2004), we noted that taken together, these two cases illustrate the full reach of section 414. "*Martens* spoke in terms of 'retained control of the independent contractor's work' and whether '[the] defendant's safety program sufficiently affected a [sub]contractor's means and methods of doing its work.' " *Cochran*, 358 Ill. App. 3d at 877, quoting *Martens*, 347 Ill. App. 3d at 318. On the other hand, *Moss* "was decided on the theory of direct liability for failing to exercise what the court termed a 'specific mandate for safety contained in the contracts.' " *Cochran*, 358 Ill. App. 3d at 877, quoting *Moss*, 344 Ill. App. 3d at 783.

In examining whether the defendant owed plaintiff a duty of care by virtue of retained control, we analyzed the nature of the defendant's involvement on the job site. We noted that the

defendant did not employ a full-time safety manager, did not conduct safety meetings for its subcontractors, did not require its superintendent to do daily walk-throughs, did not get involved in the specific details of the subcontractors' safety means, and did not inspect for safety violations, and that only specified people (as opposed to all employees) could stop work upon observing safety violations. *Cochran*, 358 Ill. App. 3d at 877. We noted the recent decisions on this topic found that the reservation of a right to inspect, start and stop work, order changes to specifications and plans, and ensure that the work was done safely did not show that the general contractor retained control over the independent contractor's work. See *Cochran*, 358 Ill. App. 3d at 878-79, citing *Kotecki v. Walsh Construction Co.*, 333 Ill. App. 3d 583 (2002), and *Rangel v. Brookhaven Constructors, Inc.*, 307 Ill. App. 3d 835 (1999). Therefore, we determined that there was no vicarious liability because no evidence was presented that indicated the defendant so controlled the operative details of the subcontractor's work that the subcontractor's employees were not entirely free to perform the work in their own way. *Cochran*, 358 Ill. App. 3d at 879.

We then turned to the issue of whether defendant was directly liable for failure to exercise general supervisory control with reasonable care. *Cochran*, 358 Ill. App. 3d at 879. We noted that "knowledge, actual or constructive, of the unsafe work methods or a dangerous condition is a precondition to direct liability." *Cochran*, 358 Ill. App. 3d at 879-80. In *Cochran*, plaintiff admitted that the unsafe ladder setup had been in place for an hour at most before his injury. None of defendants' "competent persons" observed or knew of the unsafe setup in that short period of time. Therefore, the employer did not have either constructive or actual knowledge of the dangerous working conditions. As a result, we affirmed the trial court's grant of summary

23

judgment because the defendant was neither vicariously nor directly liable for the plaintiff's injuries. *Cochran*, 358 Ill. App. 3d at 879-80.

*Cochran* examined liability under the theories of retained control and general supervisory control. Under either theory, summary judgment was proper in this case. We begin our analysis of this case, as we did in *Cochran*, by examining whether TFSC owed Pestka a duty of care by virtue of having retained control over the operative details of the subcontractors work. The evidence in this case is that TFSC managed and provided oversight for the redevelopment of the Fort Sheridan project. Vassau and Larsen were the construction supervisors and had authority to observe the Fort Sheridan work site and stop the work of the contractors. The contractors bore the responsibility of safety, but if Vassau or Larsen knew of a life-threatening situation, he could intervene. Further, Vassau and Larsen inspected the work of the contractors to make sure it was done pursuant to the terms of the contract. TFSC conducted a weekly meeting with its subcontractors during which time the subcontractors could bring up issues of concern to them, including safety. Midwest's jobsite supervisor, Augustine, testified that he received instructions from Vassau regarding what building to demolish and when it needed to be demolished by, but Vassau never told Augustine how to work. On one occasion, Mike Tracy advised Midwest that Midwest had not removed enough dirt from some concrete it had been crushing for a recycling project. As stated in *Cochran*, the ability to inspect, start and stop work, modify specifications and plans, and ensure that work is done safely is not enough to show retained control over the contractor. *Cochran*, 358 Ill. App. 3d at 878-79. Therefore, because there was no evidence presented that TFSC controlled the operative details of its contractors' work such that the

contractors' employees were not entirely free to perform the work in their own way, we find that TFSC is not vicariously liable for Edward's injuries. *Cochran*, 358 Ill. App. 3d at 879-80.

Turning to the issue of direct liability, as we did in *Cochran*, we look to see whether TFSC had either actual or constructive knowledge of the dangerous condition. *Cochran*, 358 Ill. App. 3d at 879-80. Similar to *Cochran* where the evidence indicated that the dangerous condition existed for a short period of time, both Edward and Augustine acknowledged that the events surrounding the accident in this case happened very quickly. Edward said that the accident happened shortly after Augustine started loading the trailer. Augustine said he had already loaded five beams and the accident happened as he tried to load the sixth beam. In any event, both Edward and Augustine acknowledged that the lapsed time from when Edward parked his truck to the time the accident occurred was no more than five minutes. There is no evidence in the record that anyone associated with TFSC knew or had notice of Augustine loading Edward's trailer within this " ' "restrictive time period." ' " *Cochran*, 358 Ill. App. 3d at 880, quoting <u>Rangel</u>, 307 Ill. App. 3d at 839, quoting <u>Bezan v. Chrysler Motors Corp.</u>, 263 Ill. App. 3d 858, 864 (1994). Therefore, TFSC was not directly liable for Edward's injury because TFSC did not have either actual or constructive knowledge of the dangerous condition. *Cochran*, 358 Ill. App. 3d at 379-80. Accordingly, we find the trial court properly granted TFSC's motion for summary judgment.

The decision of the circuit court of Cook County is affirmed.

Affirmed.

CAHILL and J. GORDON, JJ., concur.