2023 IL App (1st) 230198-U
Order filed August 3, 2023

FIRST DISTRICT
FOURTH DIVISION

No. 1-23-0198

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| *In re* J.A., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| Appellee, | ) | Cook County. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | Nos. 22 JA 121 |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Honorable |
| | ) | Bernard Sarley and |
| C.M. and J.A. Sr., | ) | Maxwell Griffin, |
| | ) | Judges, presiding. |
| Respondents | ) | |
| | ) | |
| (C.M., Respondent-Appellant; J.A. Sr., | ) | |
| Respondent-Appellee)). | ) | |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Justices Hoffman and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held:*    We affirmed the portions of the disposition order which found that the father was fit and the mother was not fit to parent the minor and ordered that the minor remain in the father's care and custody. We vacated the portion of the disposition order which vacated an order of protection. We also vacated the closure order where the findings that it was in the best interest of the minor and there was no need for further monitoring were against the manifest weight of the evidence as to certain issues.

¶ 2    The circuit court found that J.A., the minor son of C.M. (the mother) and J.A. Sr. (the father), was abused and neglected. Following a disposition hearing, the circuit court entered two orders. In the first order, the court adjudicated J.A. a ward of the court; found the mother unable for some reason other than financial circumstances alone to care for, protect, train, or discipline J.A. and the father fit, willing, and able to care for, protect, train, and discipline J.A.; ordered that J.A. remain in the care and custody of the father; and vacated the order of protection under which J.A. was placed with the father pursuant to 705 ILCS 405/2-25 (West 2022) (section 2-25 order of protection) (disposition order). In a separate order, pursuant to the father's motion, the court terminated J.A.'s wardship and guardianship and closed the case after finding that it was in J.A.'s best interest and the family was not in need of further monitoring (closure order). On appeal, the mother argues that the disposition and closure orders were against the manifest weight of the evidence and her counsel was ineffective for leaving the disposition hearing at a critical time. We affirm the findings that the mother is unfit and that the father is fit and the portion of the disposition order that ordered that J.A. remain in the care and custody of the father. We vacate the closure order and the portion of the disposition order vacating the section 2-25 order of protection.

¶ 3    At the time of the allegations, which gave rise to this matter, J.A., who was born on December 3, 2012, lived with the mother; D.M., J.A.'s younger brother; and Diego M., D.M.'s father.[1] The mother and Diego M. have a history of both domestic violence and substance abuse. At his birth, on January 10, 2022, D.M. tested positive for cocaine.

¶ 4    On February 18, 2022, the State filed a petition for adjudication of wardship alleging that J.A. was neglected pursuant to section 2-3(1)(b) [injurious environment] and abused pursuant to

_____

[1] D.M. is not a subject of this appeal and Diego M. is not a party in this court. We will include facts pertaining to them when relevant to the issues on appeal.

section 2-3(2)(ii) [substantial risk of physical injury] of the Juvenile Court Act (Act) (705 ILCS 405/2-3(1)(b), (2)(ii) (West 2022)), and a motion for temporary custody. The State also filed the affidavit of Nancy Rodriguez, an investigator for the Department of Children and Family Services (DCFS), which supported the factual allegations that the mother and Diego M. have an extensive history of substance abuse and domestic violence and the mother admitted to using cocaine during her pregnancy with D.M. She also averred that the mother, while under the influence of alcohol, attempted to take D.M. from the home of his maternal aunt, A.G., (the aunt), where he had been placed under a safety plan.

¶ 5    The circuit court, on February 22, 2022, entered orders taking temporary custody of J.A., granting the DCFS guardianship administrator with the right to place him, and appointing a guardian *ad litem* (GAL). The court set a temporary custody hearing for February 24.

¶ 6    On that date, the court entered an order finding that the father was not the custodial parent at the time of the abuse and neglect allegations, the father's home was safe and secure, and it was in J.A.'s best interest that he be placed in the care of the father. The court also entered the accompanying section 2-25 order of protection.

¶ 7    During a March 30, 2022 hearing, the court heard testimony from Loan Huynh, a caseworker with Lawrence Hall.[2] She visited the father's home on March 1 and spoke privately with J.A. The home was safe and appropriate with no indication of abuse, neglect, or corporal punishment. The father's wife, M.Z., and their two daughters also lived in the home. J.A. felt secure and happy there. The father was responsive to all agency communications. He was willing to accomplish J.A.'s visitations with the mother, D.M., and the mother's family, but there had been

---

[2] The entity monitoring the family for DCFS.

scheduling difficulties. J.A. had not been assessed for services because his status was "returned home." J.A. had been referred to individual therapy but had not started the therapy due to insurance issues. The father also had not been assessed for services, "[b]ut he is aware that he has agreed to do domestic violence services." The "reason for the domestic violence referral" was an incident where the mother was pushed or fell out of a moving car that he was driving (the 2015 incident).

¶ 8    Subsequently, Lawrence Hall completed an April 5, 2022 integrated assessment report based on interviews and assessments of the mother and Diego M. This assessment did not include J.A. or the father. The mother discussed her history and relationships with the father and Diego M.

¶ 9    Around the age of 16, she began dating the father and lived with him after the birth of J.A. During their time together, there were verbal arguments and minor physical acts of domestic violence. Their relationship ended after the 2015 incident. According to the mother, during that incident, she was intoxicated and the father had also been drinking. As a result of her fall from the car, the mother suffered serious injuries and was hospitalized for months and prescribed opiates. She did not remember exactly what happened. The mother continued to use opiates "on and off" including during her pregnancy with D.M.

¶ 10    The mother became involved with Diego M. in 2016 or 2017. From the start, they had verbal and physical arguments. At times, she threatened Diego M. with a knife but never cut him.

¶ 11    At a hearing on May 25, 2022, a Lawrence Hall supervisor informed the court that J.A. was doing satisfactorily in school and was visiting with D.M. She recommended that J.A. continue to live with the father as the home was safe and appropriate.

¶ 12    The circuit court commenced an adjudication hearing on July 29, 2022.

¶ 13    The State called Rodriguez as the first witness. From September 2021 to March 2022, Rodriguez conducted an investigation of several allegations involving the mother and Diego M.

4

and interviewed both of them. The mother admitted to using cocaine during her pregnancy with D.M. and reported domestic violence between herself and Diego M. Diego M. acknowledged that there had been domestic violence between him and the mother and that he used cocaine.

¶ 14    The mother told Rodriguez there also had been domestic violence between her and the father, including the 2015 incident. The father told Rodriguez that during that incident, the mother was under the influence of alcohol, they were arguing, and the mother tried to punch him. She opened the car door and stepped out of the moving car.

¶ 15    On February 8, 2022, Diego M. made a new report of domestic violence. The mother put D.M. in his bassinet which she had moved to the kitchen. Diego M. started video recording her and the mother chased him with a kitchen knife. After seeing the recording, Rodriguez imposed a safety plan and placed J.A. and D.M. with the aunt. J.A. was later moved to the father's home.

¶ 16    J.A. told Rodriguez he had witnessed the mother and Diego M. fight. During the recent knife incident, J.A. heard the mother pull a knife out of a drawer but did not see the event.

¶ 17    Under questioning by the father, Rodriguez said that the father told her he had not been aware of the mother and Diego M.'s domestic violence as the mother would not let him see J.A.

¶ 18    On re-direct examination, Rodriguez testified that there was no indication of domestic violence between the father and M.Z. and no history of DCFS involvement.

¶ 19    At the request of the State and without objection, the court entered into evidence the mother's Loyola Hospital records and D.M.'s Northwestern Hospital records. The Loyola records showed that the mother, when pregnant, was seen at the emergency room, on August 8, 2021, after an argument with Diego M. where he pulled her out of a car and she fell on her stomach. The Northwestern records showed that D.M. and the mother tested positive for cocaine at D.M.'s birth.

¶ 20    In a written order, the court made findings that J.A. had been neglected due to an injurious environment and abused due to a substantial risk of injury (705 ILCS 405/2-3(1)(b), 2-3(2)(ii) (West 2022)) and that the mother was the perpetrator.

¶ 21    On October 26, 2022, the date set for a disposition hearing, the mother was not in court. Gail Adams, the caseworker for J.A., testified that the mother was in the hospital after an argument with Diego M.

¶ 22    Adams also gave an update on the status of the case. The mother and Diego M.'s visitations had been suspended. The father was communicating well with the mother's family as to visits with J.A.; the father had even agreed to visitations on nonscheduled weekends. After a discussion with the parties as to whether to proceed on J.A.'s case only and over the objection of the father, the court continued "the case for disposition and possible case closure as to [J.A.]'s case."

¶ 23    The court began a disposition hearing as to both minors, on January 6, 2023.[3]

¶ 24    Prior to testimony, the court took judicial notice of the July 29, 2022 adjudication findings. The court also admitted into evidence, without objection, the State's exhibits, the April 5 integrated assessment and a service plan dated August 23, 2022, and the mother's exhibits, a letter dated February 21, 2022 enrolling the mother in a parenting and family stabilization class and a certificate of completion of that four-hour class dated January 6, 2023.

¶ 25    The April integrated assessment (see *supra* ¶¶ 8-10) included recommendations that the mother participate in a psychiatric follow-up, individual therapy, substance abuse treatment, domestic violence assessment and treatment, and parenting education. The service plan revealed that J.A. was doing well with the father and there were no unusual incidents.

---

[3] Judge Bernard Sarley had presided over the matter until his retirement. Judge Maxwell Griffin then was assigned and presided over the disposition hearing.

¶ 26    Adams, called as a witness by the State, testified that she was assigned as the caseworker in August 2022, but had been involved in visitations beginning in June. J.A., now ten years old, had been placed with the father in February 2022. Adams visited the home on the day prior to the hearing and found it safe and appropriate, with no signs of abuse, neglect, or corporal punishment. There had been no reports of unusual incidents. J.A.'s health records were up to date. He was in the fourth grade with "awesome" grades and participates in Taekwondo.

¶ 27    The agency had recommended that J.A. undergo individual therapy because of the trauma he experienced while living with the mother, but he had not started the therapy due to continuing insurance issues. The father was attempting to obtain a birth certificate and social security card for J.A. in order to obtain insurance coverage.

¶ 28    While the mother had completed the parenting classes and domestic violence services, she had failed to fulfill all of the other required services. And because she recently was hospitalized following a fight with Diego M., she was referred again to domestic violence treatment. The mother was diagnosed with bipolar disorder but was not on medication for the condition. In September 2022, the mother's visitations with both children were suspended until she had three negative toxicology tests after a report that the mother and Diego M. were under the influence and fighting at a visit with the children. The mother had not yet met this condition.

¶ 29    Adams testified that the father had not been assessed for services because he did not have custody of J.A. when the case came into the system. The court interrupted the examination and raised concerns that the father had not received an assessment. The GAL agreed that the father should have undergone an assessment. The father's attorney responded that the father had been fully cooperative with Lawrence Hall/DCFS and the court and had been present on prior court

dates and available for any inquiries. The court continued the hearing to January 25, 2023 to allow Lawrence Hall to consider the issue.

¶ 30    Before the next hearing date, Lawrence Hall performed an integrated assessment based on interviews of J.A., the father, and M.Z. in their home and a family assessment activity which also included the two children of the father and M.Z. Lawrence Hall prepared a January 18, 2023 written report (January assessment).

¶ 31    On January 25, 2023, the circuit court recommenced the disposition hearing. The court admitted into evidence, at the request of the State, the January assessment without objection.

¶ 32    The January assessment provided details about the backgrounds of the father and M.Z. and their relationships with J.A. and their other two children. The family lives in an apartment building; members of M.Z.'s extended family live in the other apartments. The home is clean, safe, and appropriate. The father is an electrician with his own business; M.Z. also works. The children's regular daily schedule includes school, homework, Taekwondo, and bedtime routines. Both the father and M.Z. are involved in these daily activities. On the weekends when J.A. is not visiting with D.M. and the aunt, they all spend time together.

¶ 33    The father and M.Z. had good childhoods with no history of abuse, mental illness, or gang involvement. They have been married since 2014 and report no domestic violence.

¶ 34    The father and M.Z. are committed equally to each of the three children and the entire family is bonded. They demonstrate love for the children through acts and words which express affection. The father and M.Z. deny the use of corporal punishment. Instead, as discipline, the children will lose privileges, for example, the use of toys, games, or television. The father and M.Z. also "expressed understanding that [J.A.] is attached to his mother and that it is in [J.A.'s] best interest to maintain his connection with her."

¶ 35     When he began living in the home, J.A. was quiet and insecure. He has become the most talkative and active member of the family as observed by the assessor. At first, he also was quick to anger and became frustrated easily. With the father's help, J.A. no longer exhibits aggression. J.A. needed constant confirmation that he would be picked up from school or other places because the mother had often been late. Before coming to live with the father, J.A. had poor academic attendance and untreated eczema. The father and M.Z. have ensured that J.A. consistently attends school and is treated for eczema.

¶ 36     The father reported incidents of domestic violence from the mother during their relationship. When angry, the mother would throw objects at him and hit him; on one occasion, she hit him with a pipe while he was holding J.A. as a baby. According to the father, the 2015 incident took place during an argument and the mother was hitting him while he was driving. The assessment narrative referred to the mother's admission that "she was quite inebriated" at that time.

¶ 37     The father revealed that he had been charged with driving under the influence (DUI) in 2015 (where he pled guilty and completed probation) and 2021 (where the charge remains pending). J.A. had talked with the father about how the mother and Diego M.'s substance abuse had deeply troubled him. The father stopped drinking in 2021 and M.Z. does not drink. The father wants J.A. to feel safe and secure; they do not keep alcohol in their home.

¶ 38     The January assessment recommended that J.A. be referred to an individual child therapist with experience in child trauma or domestic violence and that the father and M.Z. participate in collateral sessions as needed in order for them to provide support for J.A. The assessment further provided that if J.A. develops trauma-related symptoms when he is older, clinical services for him and the family may be required. The assessment did not recommend services for the father.

¶ 39    The State continued its direct examination of Adams; her testimony included a discussion of the January assessment. Adams testified that a clinician at Lawrence Hall "is working" on an individual therapy referral for J.A. Prior to the January assessment, the agency was unaware of the father's DUI charges; she did not know the status of the 2021 charge. The agency had not staffed or discussed substance abuse treatment or domestic violence treatment for the father. She thought the agency would be addressing these issues.

¶ 40    Adams testified that based on the January assessment and discussions with her supervisor, they were recommending that J.A. remain with the father and the case be closed. They believed this disposition was in the best interest of J.A. Adams had no doubt that the father would make sure that J.A. received therapy, because he "did everything we've asked."

¶ 41    When questioned by the GAL, Adams testified that the tensions which existed between the father and the maternal family early in the case have eased. J.A. has been visiting with D.M., the aunt, and the grandmother. The father has no objection to the continuation of these visits and directly communicating with the aunt about J.A. if the case was closed.

¶ 42    Under cross-examination by the mother, Adams reiterated that, prior to the January assessment, the agency was unaware of the father's pending DUI charge and has not staffed or made any recommendations related to the charge or his claim of being a victim of the mother's domestic violence. Adams acknowledged that the aunt and grandmother had expressed fear that the father would end their contacts with J.A. The father communicates with the grandmother but not the aunt as to scheduling visitations.

¶ 43    After completing her cross examination, the mother's counsel informed the court that she needed to check on a client in a different proceeding. When asked by the court if the disposition hearing could continue, counsel responded: "Yes. That's fine. I'll be right back."

¶ 44    The father then questioned Adams who testified that the January assessment interviewer was aware of the nature and purpose of the assessment and the circumstances of the case and did not recommend any services for the father. The assessor examined the home and found no alcohol. J.A. did not report alcohol use by the father or M.Z.

¶ 45    Adams agreed that the January assessment includes findings that the father's home was safe, appropriate, and stable and the father displays positive parenting techniques. J.A. has gained comfort, trust, and security in the home. J.A. visits with the maternal family every other weekend. The father would be more successful in obtaining insurance coverage for J.A.'s individual therapy if he had "formalized custody" and J.A.'s birth certificate. The father has never failed to cooperate with the agency.

¶ 46    Before beginning her cross of Adams, the attorney for Diego M. asked the court whether she should wait for the mother's counsel to return. The court said, "I asked her specifically if we could continue. She said yes" and told the attorney to proceed with her questioning. After this cross examination, the State rested.

¶ 47    The GAL then called the aunt as a witness who testified that throughout the case, J.A. has visited her home or the grandmother's home every other weekend, from Friday to Sunday. The aunt stopped arranging the visits with the father because of miscommunications. She has concerns that if the case was closed that she and the rest of the maternal family would see J.A. less. She believes it is in J.A.'s best interest that he continue to have contact them. The aunt has not spoken to the father about continuing visits.

¶ 48    Under cross-examination by the father, the aunt agreed that J.A. was with them on Christmas and that her requests to see him on certain unscheduled dates or weekends had been

met, presumably with the father's acquiescence. The father has never directly expressed that he would end her contacts with J.A. if the case was closed.

¶ 49    Although it is not clear from the record, at some point, the mother's attorney had returned to the proceedings as the record shows she declined the opportunity to question the aunt. Following that, the GAL and the mother rested.

¶ 50    Diego M. rested after recalling Adams and testifying on his own behalf. The father rested without calling witnesses. The parties presented closing arguments which centered on their positions as to whether the case should be closed.

¶ 51    The State, the GAL, and the mother argued against case closure where there was no information regarding the father's pending DUI and questions existed as to whether he received an alcohol evaluation and treatment in connection with the charge and whether he should participate in a domestic violence assessment and treatment in light of his history with the mother. They believed these issues should be staffed. They also had concerns that J.A. had not yet received the recommended individual therapy. The GAL and the mother also asked for the case to stay open for mediation as to J.A.'s visitations with the maternal family.

¶ 52    The GAL, however, recommended that the court find the father to be fit, willing, and able to parent J.A. and that J.A. remain in the care of his father with a section 2-24 order of protective supervision (750 ILCS 405/2-24 (West 2022)). The State and the mother made no arguments as to the father's fitness to parent J.A. The mother did comment that J.A. was doing well in the father's care aside from his need for therapy and missing the mother.

¶ 53    The father argued he should be found fit, willing, and able to parent J.A. as demonstrated by the January assessment. The father asked the court to close the case, arguing that further monitoring was not necessary.

¶ 54    At the conclusion of the hearing, the circuit court orally found the father fit, willing, and able to care for J.A. and that the mother was unable for some reason other than financial circumstances alone to care for, protect, train, or discipline J.A. The court also determined that it was in J.A.'s best interest to close the case, reasoning that there was no evidence of harm or risk to J.A. while he has been with the father. The father has stopped drinking alcohol and shown a willingness to obtain therapy for J.A. and continue J.A.'s visitations with the mother's family.

¶ 55    The court entered the disposition order adjudicating J.A. a ward of the court, repeating its fitness findings, vacating the section 2-25 order of protection, and ordering that J.A. remain in the care and custody of the father. The court also entered the closure order granting the father's motion to close the case finding that it was in J.A.'s best interest and the family was not in need of further monitoring. The closure order terminated the section 2-25 order of protection and J.A.'s wardship and guardianship and ordered that J.A. remain in the custody of the father. The mother has appealed.

¶ 56    The mother argues that the circuit court's findings following the disposition hearing are against the manifest weight of the evidence and therefore the case should not have been closed. She also maintains that her counsel's conduct in leaving the disposition hearing was presumptively ineffective or ineffective under the standards of *Strickland*.

¶ 57    The Act provides a "step-by-step process used to decide whether a child should be removed from his or her parents and made a ward of the court." *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). Once the State has filed a petition for wardship and a child has been placed in temporary custody, the circuit court first conducts an adjudicatory hearing to determine whether or not the minor is abused, neglected, or dependent. *Id.*; 705 ILCS 405/2-18(1), 21(1) (West 2022). After the court finds abuse or neglect, it then conducts a disposition hearing to determine if it is in the best interest

of the minor and the public that he be made a ward of the court. *In re Z.L.*, 2021 IL 126931, ¶ 60; 705 ILCS 405/2-21(2) (West 2022).

¶ 58    Here, after the filing of the petition for wardship and placing J.C. in temporary custody, the court found that J.A. was abused and neglected and the mother was the perpetrator. The court proceeded to a disposition hearing and found that it was in the best interest of J.A. to make him a ward of the court. The mother has not challenged these findings.

¶ 59    After a minor is made ward of the court, the court next determines the proper disposition best serving the health, safety, and interests of the minor and the public. 705 ILCS 405/2-22(1) (West 2022). There are four basic dispositional orders, the minor may be: (1) continued in the care of the minor's parent, guardian, or legal custodian; (2) restored to the custody of the minor's parent, guardian, or legal custodian; (3) ordered partially or completely emancipated; or (4) placed in accordance with section 2–27 of the Act." *In re M.G.*, 2018 IL App (3d) 170591, ¶ 10 (citing 705 ILCS 405/2-23(1)(a) (West 2016); *In re M.M.*, 2016 IL 119932, ¶ 18)).

¶ 60    Prior to committing a minor to the custody of a third party, the court must first determine whether both parents are unfit, unable, or unwilling to care for the minor, and whether the best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents. *In re S.S.*, 313 Ill. App. 3d 121, 132 (2000); 705 ILCS 405/2-27(1) (West 2022). So long as a parent is fit, "there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children. (Internal quotation marks omitted.)" *M.M.*, 2016 IL 119931, ¶ 26.

¶ 61    A circuit court's decision at a dispositional hearing will only be reversed if the findings of fact are against the manifest weight of the evidence or the circuit court committed an abuse of discretion by selecting an inappropriate dispositional order. *In re J.W.*, 386 Ill. App. 3d 847, 856

(2008) (citing *In re Ta. A.*, 384 Ill. App. 3d 303, 307 (2008)). A finding is against the manifest weight of the evidence where the opposite conclusion is clearly apparent. *In re A.P.*, 2012 IL 113875, ¶ 17. The circuit court is generally vested with wide discretion because it has the best opportunity to observe the witnesses' testimony, assess credibility, and weigh the evidence. *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001). An abuse of discretion occurs "when no reasonable person would agree with its decision." *In re M.P.*, 408 Ill. App. 3d 1070, 1073 (2011).

¶ 62    Here, the circuit court found the mother unable, for some reason other than financial circumstances alone to care for, protect, train, or discipline J.A. and found the father fit, willing, and able to care for J.A. Based on the determination that the father was fit, the court ordered that J.A. remain in the care and custody of the father.

¶ 63    The GAL and the State contend and we agree that the mother did not argue below and does not argue now that the finding as to her unfitness is against the manifest weight of the evidence. She has forfeited any argument as to that finding. Il. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 64    Additionally, the GAL and the State acknowledge and we agree that the mother did not argue at the dispositional hearing that the father was not fit to parent J.A. On appeal, the mother maintains the father's fitness finding is against the manifest weight of the evidence. We believe her arguments are directed more to the findings and decision in the closure order than to the finding that the father is fit to parent J.A. Any forfeiture aside (see *id.*), the finding that the father is fit to parent J.A. was not against the manifest weight of the evidence and the order that J.A. remain in the care and custody of the father was not an abuse of discretion.

¶ 65    At the time of the disposition hearing, J.A. had been living with the father for almost one year. The father's home was found to be appropriate and safe and there were no reports of improper incidents. The father and M.Z. provide J.A. with love and support and demonstrate positive

parenting skills. He is excelling at school and is receiving all necessary medical care and engaging in outside activities. J.A. has bonded with the father, M.Z. and their daughters and feels secure and confident in the father's home and with the family. By all accounts, J.A. has thrived while living with the father. The father is committed to continuing to care for J.A. and J.A. is in need of permanency. The father understands the importance of J.A.'s continued relationship with D.M. and his maternal family. Throughout the case, Lawrence Hall recommended that J.A. remain in the care of the father after finding the home was safe, secure, and appropriate. The January assessment provides strong evidence that the father and M.Z. provide a caring home for J.A. We affirm the circuit court's finding that the father is fit and able to parent J.A. and its order that J.A. remain in his care and custody. See *S.S.*, 313 Ill. App. 3d at 132 (citing *In re M.K.*, 271 Ill. App. 3d 820, 830 (1995)) ("A fit parent has a superior right to custody of his or her child, which can only be superseded by a showing of good cause to place custody of the child in a third party.").

¶ 66     After finding the father fit and ordering that J.A. remain in his care and custody, the circuit court granted the father's motion to close the case and entered the closure order.

¶ 67     Under section 2-31(2) of the Act, "when the court determines, and that the health, safety, and the best interests of the minor and the public no longer require the wardship of the court, the court shall order the wardship terminated and all proceedings under this Act respecting that minor finally closed and discharged." See 705 ILCS 405/2-31(2) (West 2022). When making a best interest determination the circuit court should consider "the minor's physical safety and welfare, the development of his identity, his background ties, his sense of attachments, his wishes and long-term goals, his community ties, his need for permanence, and the preferences of the persons available to care for him." *In re Aaron R.*, 387 Ill. App. 3d 1130, 1138 (2008); 705 ILCS 405/1-3–3(4.05) (West 2022). We review a court's decision to terminate wardship and close a case under a

16

manifest weight of the evidence standard when the court's weighing of facts is at issue. *Aaron L.*, 2013 IL App (1st) 122808, ¶ 28 (citing *Aaron R.*, 387 Ill. App. 3d at 1141).

¶ 68    The mother maintains the findings of the closure order are against the manifest weight of the evidence. She argues that J.A. has not participated in individual therapy, the father's domestic violence and substance abuse issues were never staffed and there is no established plan for J.A.'s visitations with D.M., the aunt, and the grandmother.

¶ 69    At the end of the disposition hearing, the State and the GAL argued against closing the case. In this court, the GAL and the State acknowledge that it would have been better if J.A. received individual therapy and Lawrence Hall had at least staffed the father's DUI and domestic violence history. Nonetheless, they now argue the findings in the closure order are not against the manifest weight of the evidence and the court did not abuse its discretion in closing the case.

¶ 70    We will consider each of the mother's arguments against case closure and begin with her contention that J.A. was in need of individual therapy. From the outset, although J.A. was not initially assessed for services, Lawrence Hall recommended that J.A. participate in individual therapy to address his trauma from having lived in a household where he encountered significant substance abuse and domestic violence. The January assessment confirmed J.A.'s need for individual therapy with a therapist who specializes in domestic violence or trauma and recommended that the father and M.Z. participate in the therapy when necessary. We understand that the father cooperated with Lawrence Hall in attempting to procure J.A.'s therapy, that there were insurance issues, and that Adams strongly believed the father would make sure J.A. went to therapy. At the time of the dispositional hearing, however, the therapy had not yet taken place and Lawrence Hall was in the midst of making a referral. The manifest weight of the evidence does not support the findings that monitoring was no longer necessary or that the best interest of J.A.

17

was served by closing the case where there were no substantial steps taken to achieve the recommended individual therapy for J.A.

¶ 71     Next, we examine the mother's arguments relating to the father's unstaffed domestic violence issues. The mother in her assessment interview stated that there was domestic violence in her relationship with the father including the 2015 incident. During that incident, the mother tried to punch the father while they were in a moving car; J.A. was a passenger. The mother suffered serious injuries when she fell from the car. (Because of this incident Hunyh testified that early in the case Lawrence Hall had suggested that the father participate in domestic violence treatment.) In his interview for the January assessment, the father revealed further details about the domestic violence in his relationship with the mother, including an occasion where the mother hit him with a pipe when he was holding J.A.

¶ 72     It is true that the January assessment did not recommend domestic violence services and there is no evidence of domestic violence in the father's relationship with M.Z. or incidents of abuse with their daughters and J.A. However, in light of the domestic violence circumstances in the relationship of the father and the mother, J.A.'s exposure to some of those incidents and the trauma suffered by J.A. from living with the domestic violence between the mother and Diego M., it was not in J.A.'s best interest to close the case before Lawrence Hall staffed the reports of domestic violence in the relationship of the father and the mother and there was need for further monitoring as to this issue.

¶ 73     As to possible substance abuse issues, the evidence showed that the father was charged with DUI in the same year as the 2015 incident. During the 2015 incident, the father had been drinking and then drove a car with J.A. and the mother as passengers. He was charged with DUI again in 2021 just before J.A. came to live with him in 2022. That charge remains pending and the

18

status and circumstances of both cases are unknown. Lawrence Hall did not know of the DUI charges until the January assessment. We acknowledge the January assessment did not recommend substance abuse services, the father has stopped drinking, and there have been no incidents of substance abuse in the father's home since J.A. was placed there. However, in light of the evidence of J.A.'s traumatic experiences with the substance abuses of the mother and Diego M. and his great aversion to even seeing alcohol, it was not in his best interest to close the case without a staffing on the issue and further monitoring as to the issue was needed.

¶ 74 Finally, the mother argues that, without a plan in place, the father will limit J.A.'s visitations with D.M., the grandmother, and the aunt. At the start, there were difficulties and miscommunications with scheduling the visits, but Adams testified that those problems have ceased and the visitations have been taking place. The aunt agreed that the scheduling improved and that J.A. visits every other weekend. J.A. has been allowed to visit at unscheduled times and was with them at Christmas. The father understands the importance of J.A.'s relationships with D.M. and the maternal family and is willing to schedule those visits with the aunt. The manifest weight of the evidence supports a conclusion that there was not a need to continue monitoring visitations and this issue did not require a denial of the motion to close the case.

¶ 75 For these reasons, we conclude that the findings in the closure order that closing the case was in the best interest of J.A. and that the family was not in need of further monitoring as to achieving J.A.'s individual therapy and staffing any issues relating to domestic violence or substance abuse as to the father were against the manifest weight of the evidence. Therefore, the court abused its discretion in closing the case. and we vacate the closure order.

19

¶ 76     We next consider the mother's arguments as to her attorney's ineffectiveness. An ineffectiveness claim which is raised for the first time on appeal is reviewed *de novo*. *People v. Lofton*, 2015 IL App 2d 130135, ¶ 24.

¶ 77     Parents in abuse and neglect cases are afforded the right to effective assistance of counsel. *In re H.C.*, 2023 IL App (1st) 220881, ¶ 86 (citing *Kr. K.*, 258 Ill. App. 3d 270, 280 (1994); U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2). In determining a claim for ineffective assistance of counsel in a proceeding to terminate parental rights, we apply the criteria found in *Strickland v. Washington*, 466 U.S. 668 (1984). *In re R.G.*, 165 Ill. App. 3d 112, 127 (1988). In order to obtain relief under *Strickland*, a parent must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) this substandard performance caused the parent prejudice by creating a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. 466 U.S. 668, at 687-88, 694. We may decide an ineffectiveness of counsel claim on the prejudice prong alone without considering counsel's performance. *In re M.D.*, 2022 IL App 4th 210288, ¶ 93 (citing *People v. Hale*, 2013 IL 113140, ¶ 17).

¶ 78     The mother first argues that her counsel's performance was so deficient that prejudice should be presumed citing *United States v. Cronic*, 466 U.S. 648, 659-61 (1984). In *Cronic*, the Supreme Court stated that a constitutional error occurs "when counsel was either totally absent or prevented from assisting the accused during a critical stages of the proceeding." *Id.* at 659, n.25. In these incidences, prejudice is presumed. *Id.* at 660. The mother contends that *Cronic* applies because her counsel was critically absent during the father's cross-examination of Adams and perhaps throughout the direct examination of the aunt.

¶ 79     We need not decide whether the mother's counsel was absent during a critical juncture of the disposition hearing. *Cronic* expressly applies in the criminal context, but this court has declined

to expand its holding to termination of parental rights proceedings. See *In re C.C.*, 368 Ill. App. 3d 744, 748 (2006); *In re D.M.*, 2020 IL App (1st) 200103, ¶ 31. Therefore, we must reject the mother's argument that prejudice is presumed here.

¶ 80    The mother also argues that she has shown prejudice under the second prong of the *Strickland* analysis. The second prong requires a showing of actual prejudice and not mere speculation. See *People v. Bew*, 228 Ill. 2d 122, 135 (2008).

¶ 81    Specifically, the mother argues that her counsel's absence during the father's cross of Adams prevented counsel from a recross of Adams on the issues of the father's unstaffed substance abuse and domestic violence issues and visitation concerns. She also argues that counsel's absence during the entirety of the GAL's examination of the aunt prevented her counsel from crossing the aunt on visitation.

¶ 82    Any prejudice relating to a possible recross-examination of Adams by her counsel on the father's unstaffed substance abuse and domestic violence questions has been addressed by our decision to vacate the closure order as to those issues.

¶ 83    The claim that prejudice resulted from the absence of the mother's counsel during the father's cross-examination of Adams and possibly during the GAL's direct examination of the aunt as to visitation is speculative.

¶ 84    The mother's counsel was present during Adams's direct examination and cross-examination by the GAL. The mother's counsel also conducted a full cross-examination of Adams. These examinations established that the father initially had a tense relationship with the mother's family about scheduling J.A.'s visits and that the aunt had expressed concerns that the father would not continue J.A.'s visits if the case was closed. The mother does not indicate what testimony

would have been elicited on recross of Adams by her counsel. She also does not contend that the father's cross-examination of Adams elicited previously unknown facts.

¶ 85    Additionally, the mother raises only a possibility that her counsel was absent throughout the GAL's direct of the aunt. It is unclear when the mother's counsel returned to the proceedings and there is no way to determine how much if any of this examination that her counsel may have missed. The mother only assumes that her counsel declined to cross the aunt because she was absent during the entirety of the direct examination.

¶ 86    The mother argues that a cross-examination of the aunt may have elicited more testimony about the significance of continuing J.A.'s contacts with the maternal family and concerns that the father would terminate visitation should the case be closed. However, as discussed, Adams testified as to the initial problems with scheduling visitations and the communication issues between the father and the aunt. Further, the aunt testified about the importance of the visitations and her fears about the father decreasing the frequency of those visitations.

¶ 87    We find the mother did not establish prejudice under *Strickland* and reject her arguments as to ineffectiveness of counsel.

¶ 88    For the reasons stated, as to the disposition order, we affirm the findings the mother is unfit to parent J.A. and that the father is fit to parent him and affirm the order that J.A. remain in the care and custody of the father. We vacate only that portion of the disposition order which vacated the section 2-25 order of protection. We also vacate the closure order as there is a need for further monitoring as to J.A.'s referral to individual therapy and for staffing of the father's domestic violence and substance abuse history as to what services, if any, may be required. The case is remanded for further proceedings consistent with this order.

¶ 89    The judgment of the circuit court is affirmed in part, vacated in part, and remanded with directions.

¶ 90    Affirmed in part, vacated in part; cause remanded.