1130

*In re* AARON R., a Minor (The People of the State of Illinois *et al.*, Petitioners-Appellees, v. Illinois Department of Children and Family Services, Respondent-Appellant).

Fourth District   No. 4—08—0677

Opinion filed January 30, 2009.

STEIGMANN, J., specially concurring.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Laura M. Wunder, Assistant Attorney General, of counsel), for appellant.

No brief filed for appellees.

JUSTICE KNECHT delivered the opinion of the court:

The Illinois Department of Children and Family Services (DCFS) appeals from an order by the circuit court of Macoupin County terminating a juvenile case involving Aaron R. DCFS argues (1) the trial court failed to comply with the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1—1 through 7—1 (West 2006)); (2) the trial court attempted to remedy its statutory failure by improperly amending its order and findings *nunc pro tunc*; and (3) the evidence before it did not support its findings made improperly *nunc pro tunc*. We agree and reverse and remand.

## I. BACKGROUND

Aaron R. was born on December 17, 2002, to Monroe and Tiffany Richardson. On March 27, 2003, the State filed a petition for adjudication of wardship alleging Aaron (1) was a dependent and neglected minor because he was without adequate medical care as he was a medically complex infant born with a double cleft palate, had special feeding needs, and was not gaining weight; (2) was without proper care due to the mental disabilities of his father; and (3) was in an injurious environment due to the lack of a stable home, inconsistency of care, and inability of parents to cooperate with medical care providers for complex medical needs.

On April 23, 2003, the trial court placed Aaron in the temporary custody of DCFS, which placed him in the custody of his maternal grandfather and his wife, the Atteberrys, as foster parents. On January 21, 2005, the court determined Aaron had failed to thrive and his

parents were not appropriately caring for him and entered an order adjudicating Aaron a neglected child based on "lack of care." On March 7, 2005, the court entered a dispositional order finding both parents unfit based on their inability to care for, protect, train or discipline Aaron. The court removed Aaron from parental custody and placed him in the custody of DCFS and under DCFS guardianship. He remained in the physical custody of the Atteberrys. The court set a permanency goal of return home in 12 months.

Over the next two years, DCFS developed service plans and made other reports to the trial court. A service plan from April 14, 2005, filed with the court, noted since Aaron's birth, he and his parents had lived with assorted relatives and neither Monroe nor Tiffany had ever exercised primary responsibility for his care. DCFS service plans and reports from the fall of 2005 indicated the parents were making significant progress in their ability to care for Aaron although DCFS custody and guardianship were recommended. On September 15, 2005, the court set a permanency goal of return home in 12 months. On December 27, 2005, the court set the permanency goal of return home in five months, gave DCFS discretion to place Aaron with his parents and maintained guardianship and custody with DCFS.

In February 2006, DCFS exercised its discretion and placed Aaron in the physical custody of his parents. On April 6, 2006, DCFS reported to the trial court the parents were "doing better" but still needed the assistance of an assigned homemaker three times per week in their home in order to properly care for Aaron. On April 11, 2006, the court entered a permanency order maintaining DCFS guardianship with the observation "parents still need assistance" and "still need additional help."

On September 28, 2006, DCFS reported the parents were making adequate progress but they continued to need the aid of a DCFS homemaker and they will continue to need this assistance for an undetermined length of time. On October 5, 2006, the trial court entered a permanency order maintaining DCFS guardianship, noting "parents need to continue to work on parenting" and "need additional assistance."

On March 3, 2007, DCFS reported the parents meet "minimal parenting standards" but several concerns remained: the parents had not obtained medical care for an ear infection Aaron contracted; the parents allowed a child pornography sex offender to stay in their home; the parents needed help in providing a clean, stable home and caring for Aaron; and "Aaron's behavior has deteriorated this six month period." On April 3, 2007, the trial court set a permanency order continuing DCFS guardianship with the goal of maintaining an intact home.

On April 5, 2007, although Aaron had always had behavior issues, Aaron attacked Tiffany, kicking, hitting and biting her and pulling out large chunks of her hair, and was completely out of control while in a waiting room to see a mental-health professional. Aaron was hospitalized for medical and psychiatric care. During his two-week stay in the hospital, neither Monroe nor Tiffany contacted Aaron or his attending physician. He was visited by the Atteberrys. On April 20, 2007, Aaron was discharged and placed with the Atteberrys upon the recommendation of his doctor. On April 23, 2007, Aaron's doctor advised the court via a letter, Aaron required a "specialized structured living environment," Aaron's grandparents could best fulfill his needs and Aaron's parents had not contacted him *once* during his hospital stay.

On April 23, 2007, Monroe filed a petition for the immediate return of Aaron to his custody. The petition alleged after the adjudication of neglect, the parents "made significant improvements" and Aaron had been "returned to their physical custody, with DCFS guardianship." Aaron had been removed from his parents' home for medical treatment and upon discharge had not been returned to them. Monroe requested "return of said child to [the father's] care and custody immediately."

On May 5, 2007, the State filed a petition for supplemental relief seeking Aaron be declared a neglected minor for additional reasons. Based on events occurring after the original adjudication of neglect, the State alleged Monroe and Tiffany missed doctors' appointments, allowed a sex offender to stay at the family home, and allowed Aaron's prescribed medication to run out 14 days early.

On June 27, 2007, the trial court held an evidentiary hearing on the State's supplemental petition. Testimony revealed the homemaker assigned to the Richardsons had been working for them for close to four years and tried to promote proper parenting, homemaking, and compliance with medical needs, including understanding doctors' instructions. Aaron has developmental delays and needs more attention than his younger brother. After he was returned to the parents' home, he was frequently observed engaging in aggressive behavior such as swearing, hitting, kicking, biting, and pulling hair. The incident prompting his hospitalization included all of those behaviors. During the hospitalization, he was prescribed Risperdal for his behavior, which he continued to take upon release. The hospital psychiatrist diagnosed Aaron with "pervasive developmental disorder."

One of Aaron's physical problems was an inability to gain weight. Since he was released from the hospital and staying with his grandparents, he was gaining weight and seemed "easier to manage." He was calmer and was not exhibiting the aggressive, negative behaviors he had been earlier.

When the homemaker observed Aaron had an ear infection in December 2006, she urged Monroe and Tiffany to make a doctor's appointment. They responded they could not get him in until a regularly scheduled appointment in January 2007. The homemaker obtained an appointment for Aaron the very next day.

Testimony was also presented concerning an irregularity in giving Aaron his medication. When he was prescribed medication for attention deficit/hyperactivity disorder (ADHD) in March 2007, the homemaker observed the supply ran out early; it should have lasted 14 days longer with 14 additional pills. The prescription could not be refilled early because it was a controlled substance. Tiffany told the homemaker eight or nine of the pills had been damaged and not used because she crushed them into applesauce which Aaron then refused to eat. Previously, Tiffany told the homemaker Aaron "just took [the pills] whole and like[d] to chew them up."

Finally, testimony was presented concerning a registered sex offender who had temporarily lived with the Richardsons in December 2006. He was Monroe's brother and stayed with them for five days after Christmas. Both parents were aware he was a sex offender and had been cautioned not to allow him access to the children. The homemaker saw the sex offender at the Richardson home twice. On one visit, Aaron and his younger brother were in the living room with their uncle while Monroe and Tiffany were just getting out of bed.

The trial court concluded the allegations of the supplemental petition were not proved by a preponderance of the evidence. The court specifically found insufficient evidence of neglect in the irregular apportioning to Aaron's medication. Further, the court found allowing the sex offender in the home, because no harm came to Aaron and his brother, did not establish neglect. However, the court did express concern over the children's exposure to a sex offender, cautioning such contact was a "big problem" and "not a situation that should be presenting itself in this home."

At the conclusion of the hearing, Monroe's counsel asked for a ruling on his petition for immediate return of Aaron to Monroe's custody based on the facts alleged in the petition and the fact the State's supplemental petition was not going forward. The guardian *ad litem* (GAL) stated this was a "tough case" but supported return of Aaron to parental custody, noting "there are certainly things the parents need to be working on. It's not the perfect situation." The trial court granted Monroe's petition. The court's written order, entered the same day as the hearing, denied the State's petition and granted Monroe's petition for immediate return of Aaron to his custody. The order further stated "DCFS is directed to return Aaron [R.] to the

physical care of his parents." The order did not mention the guardianship. The guardianship was not mentioned at any time during the hearing by the court or any of the parties.

On October 2, 2007, the case was called for a permanency hearing, which the trial court continued to December 4, 2007. On November 5, 2007, the Atteberrys filed petitions to intervene and to obtain custody of Aaron. They alleged Aaron's mental, physical, and emotional health had regressed since he was returned to parental custody and they alleged the parents' fitness was at issue because Aaron's violent behaviors had returned and his medications and hygiene were neglected. On November 13, 2007, Monroe filed a motion to dismiss the Atteberrys' petitions, arguing they "lacked standing" because the trial court had returned Aaron to the custody of his parents. On November 29, 2007, DCFS filed a progress report with the court in anticipation of the December 4 permanency review hearing. The report expressed concern Aaron's behavior had regressed since he had been returned to his parents' custody and he was out of control both at home and at school. After two years of intensive services the parents were not ready to care for Aaron on their own and further improvement was unlikely. The homemaker's assistance was still required multiple times per week and the parents were unresponsive to family therapy, managing money and planning for the children's needs. DCFS also noted the consistent positive presence of the Atteberrys in Aaron's life and stated it was in Aaron's best interest custody and guardianship of Aaron be given to the Atteberrys.

On December 4, 2007, counsel for Monroe suggested to the trial court it had closed this case at the June 26, 2007, hearing by returning custody to the parents. The court responded by ordering a transcript of the June proceedings and continued the hearing, including Monroe's motion to dismiss the Atteberrys' petition.

On March 10, 2008, DCFS filed a motion to maintain DCFS as guardian of Aaron. DCFS noted the distinction between "custody" and "guardianship" and argued the case had not been closed and guardianship in DCFS continued; regardless of who had physical custody of Aaron, the March 7, 2005, dispositional order, granting DCFS guardianship and the court wardship still continued. Further, the scheduling of a permanency review hearing following the June 26 hearing suggested the case was not closed.

On March 13, 2008, the trial court held a hearing on the Atteberrys' petitions to intervene and obtain custody and Monroe's motion to dismiss those petitions. Monroe argued the "crux" of his motion fell back on the hearing on June 26, 2007. While he acknowledged the court's order did not refer to guardianship, he maintained "it was

intended that custody and guardianship be returned to the parents" at that time; therefore, custody and guardianship had reverted to the parents in June 2007 and the Atteberrys lacked standing to intervene as there was no active case. Counsel for Tiffany as well as counsel for Monroe asserted, after the close of the June 26, 2007, hearing, there was a discussion concerning the parents agreeing to accept DCFS services voluntarily. The GAL stated he could not remember whether that discussion was on or off the record but he did recall something was said to the effect it would be a good idea if the parents continued to get services and then the parties went back into the courtroom and talked about this for quite some time. The GAL had no doubt it was in Aaron's best interest Monroe and Tiffany continue to get services because "they can use the help."

The State and DCFS took the position DCFS guardianship had not been discharged at the June 26, 2007, hearing. They noted neither Monroe's petition nor the trial court's order addressed DCFS guardianship. Believing itself to still be Aaron's guardian, DCFS had been continuing services and anticipated a permanency review would take place as scheduled in December 2007.

DCFS argued even though its supplemental petition had been denied, its original petition was granted and the court's disposition on that petition still continued. It also noted return of guardianship was usually a gradual process once custody was returned to parents.

The trial judge stated her view "there was supposed to be *** informal contact with DCFS" and DCFS could file "some type of a petition" if a "bad situation" arose. Counsel for DCFS replied lack of "immediate and urgent necessity" to remove a child from home "doesn't mean the whole case should be dismissed."

The trial judge concluded she had dismissed the case on June 26, 2007. She did not care what relief Monroe's petition was actually seeking, she was going on what happened at the time of the hearing. The hearing was held and she "discharged [the case] back at that point in time." The court then went on to grant Monroe's motion to dismiss the Atteberrys' petitions and entered a form order which stated "Wardship is terminated and all proceedings in this cause are closed and discharged."

On March 24, 2008, DCFS filed a motion to reconsider the order of March 13 terminating the proceedings. DCFS argued termination of wardship and guardianship was neither requested by Monroe nor specified in the June 26, 2007, order. DCFS also contended before proceedings may be terminated under the Act, the trial court must make written findings that terminating the case would serve the minor's best interests and must hold a hearing and enter an order

concerning the proposed custodian's fitness. 705 ILCS 405/2—31(2) (West 2006). DCFS also argued the evidence heard on the State's supplemental petition revealed a family still needing supervision and assistance and DCFS service plans filed with the court from April 30, 2007, to October 31, 2007, found unsatisfactory progress by the parents; therefore, the evidence supported maintaining wardship in the court and guardianship in DCFS. DCFS asked the court to reinstate the proceedings and continue DCFS guardianship.

On July 20, 2008, a hearing was held on the motion to reconsider. DCFS fleshed out the arguments made in its written motion. Monroe conceded his petition for return of physical custody of Aaron addressed only custody and the court order granting that petition was "prepared in inappropriate fashion" as it did not include the findings required by the Act. He suggested the trial court make the findings *nunc pro tunc* to the June 26, 2007, hearing. The GAL stated DCFS guardianship should be vacated, explaining he had not seen evidence suggesting Aaron should not be in parental custody.

The trial court denied the motion to reconsider and made certain findings. The court stated the goal of the case had been to return Aaron to his parents and DCFS progress reports from 2005 and 2006 showed substantial progress and by 2007 Aaron was living at home with his parents. Thus, the parents were in the position of being able to adequately care for Aaron. The problems previously existing were "basically cleared up." Further, there was no testimony presented at the June 26 hearing concerning recommendations from Aaron's psychiatrist or that doctor's appointments had actually been missed for Aaron's ear infection. The court stated the law's assumption is children should be in the home of their parents and that is the ultimate goal of both DCFS and the Act. The parents were now in a position to adequately care for Aaron and it is in his best interest to be back home with his parents.

The trial court ordered the court reporter to transcribe its remarks and place them in the file *nunc pro tunc* to June 26, 2007. The court then entered written order denying the motion to reconsider. This appeal followed.

## II. ANALYSIS

DCFS contends the trial court failed to comply with section 2—31(2) of the Act, attempted to remedy its statutory failure by improperly amending its order and findings *nunc pro tunc* and, finally, the evidence before it did not support its findings made improperly *nunc pro tunc*. Neither Monroe nor Tiffany has filed a brief in this appeal. However, when an appellee files no brief, the record is simple

and the claimed error can be decided without such assistance, the appeal will be decided. *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133, 345 N.E.2d 493, 495 (1976).

### A. Failure To Comply With Section 2—31(2) of the Act

Whether the trial court failed to follow statutory requirements presents a question of law subject to *de novo* review. *In re Jaime P.*, 223 Ill. 2d 526, 532, 861 N.E.2d 958, 962 (2006).

In March 2005, the trial court adjudicated Aaron R. a neglected minor, found his parents unfit to provide for his medical and other needs and made Aaron a ward of the court under the guardianship of DCFS, following the procedures of the Act. 705 ILCS 405/2—3(a), 2—22(1) (West 2004). On March 13, 2008, the trial court terminated the proceedings, retroactive to June 26, 2007, and on July 29, 2008, added certain findings, also retroactive to June 26, 2007. However, the Act requires courts to follow certain statutory requirements before terminating proceedings initiated under the Act. 705 ILCS 405/2—31(2) (West 2006). DCFS argues the trial court did not follow those proceedings in this case. We agree.

■ Under section 2—31(2), a trial court may only terminate proceedings "[w]henever the court determines, and makes written factual findings, that health, safety, and the best interests of the minor and the public no longer require the wardship of the court." 705 ILCS 405/2—31(2) (West 2006). If the court so determines, the court shall order the wardship terminated and all proceedings under the Act with respect to the minor in question are closed and discharged. 705 ILCS 405/2—31(2) (West 2006). Whenever a best-interest determination is required under the Act, the court must evaluate the minor's physical safety and welfare, the development of his identity, his background and ties, his sense of attachments, his wishes and long-term goals, his community ties, his need for permanence, and the preferences of the persons available to care for him. 705 ILCS 405/1—3(4.05) (West Supp. 2007).

Contrary to section 2—31(2), at the time of the June 26, 2007, hearing, the trial court failed to consider whether terminating the wardship, and consequently, terminating DCFS guardianship, would serve the "health, safety, and *** best interests of the minor and the public" (705 ILCS 405/2—31(2) (West 2006)). Because the court did not consider this issue, it did not make the required written findings. Even in its later orders, the court still did not consider and make findings about whether wardship should be terminated.

In addition, before a guardianship is discharged as part of terminating wardship, section 2—31(2) requires the trial court to

ensure compliance with section 2—28. 705 ILCS 405/2—31(2) (West 2006). Section 2—28 provides "[c]ustody of the minor shall not be restored to any parent *** unless the minor can be cared for at home without endangering his or her health or safety and it is in the best interest of the minor." 705 ILCS 405/28(4) (West 2006). Further, the court is precluded from returning a minor to the custody of a parent whose actions caused the minor to be adjudicated neglected until "a hearing is held on the issue of the health, safety[,] and best interest of the minor and the fitness of such parent *** to care for the minor and the court enters an order that such parent *** is fit to care for the minor." 705 ILCS 405/28(4) (West 2006).

∎ The proceedings of June 26, 2007, did not satisfy these statutory requirements. The trial court did not enter an order finding Monroe and Tiffany fit to care for Aaron and the court has never entered such an order. The evidence heard on June 26, 2007, pertained to the State's petition alleging *additional* reasons Aaron should also be adjudicated neglected. At the close of the hearing, Monroe's counsel only requested physical custody of Aaron be returned to him on the grounds the State failed to prove the supplemental allegations of neglect. No evidence was heard concerning the overall fitness of Monroe to meet Aaron's complex medical and other needs and to provide a stable home with consistent care—even though those were issues leading to the court's original adjudication of unfitness in March 2005. No evidence was heard concerning Tiffany, who was responsible for day-to-day child care. The court did not consider the statutory "best interests" factor, including Aaron's wishes and sense of attachments.

In June 2007, what was requested and ordered was a return of Aaron to his parents' physical care, not a discharge of DCFS guardianship or the court's wardship. Aaron had been living with his parents under DCFS supervision and services with the goal that Monroe and Tiffany would someday be able to care for him independently. Thus DCFS did not object. The trial court never orally expressed the view at that hearing it was meant to serve as an overall parental-fitness hearing possibly resulting in a discharge of the entire case. The purported discharge of the case was done without complying with the Act's requirements and, thus, it is ineffectual.

### B. *Nunc Pro Tunc* Findings

Whether an order satisfies the legal criteria for a *nunc pro tunc* order is reviewed *de novo. Gounaris v. City of Chicago*, 321 Ill. App. 3d 487, 493, 747 N.E.2d 1025, 1030-31 (2001).

∎ "A *nunc pro tunc* order is an entry now for something that was

done on a previous date and is made to make the record speak now for what was actually done then." *Pestka v. Town of Fort Sheridan Co.*, 371 Ill. App. 3d 286, 295, 862 N.E.2d 1044, 1052 (2007). A *nunc pro tunc* order may only be used to correct clerical errors or matters of form in a prior judgment to make the record reflect what the court actually ordered. *Pestka*, 371 Ill. App. 3d at 295, 862 N.E.2d at 1052. Any *nunc pro tunc* correction must be based on definite and certain evidence of record and not merely the recollection of the judge or a party. *Pestka*, 371 Ill. App. 3d at 295, 862 N.E.2d at 1052. A *nunc pro tunc* order cannot be used to alter the court's judgment. *In re Marriage of Morreale*, 351 Ill. App. 3d 238, 241, 813 N.E.2d 313, 317 (2004). A *nunc pro tunc* order may not be used to correct judicial errors (*In re Jessie B.*, 327 Ill. App. 3d 1084, 1089, 765 N.E.2d 508, 512 (2002)) nor may such orders be used to supply omitted judicial action. *In re Marriage of Takata*, 304 Ill. App. 3d 85, 92, 709 N.E.2d 715, 720 (1999).

■ Here, the trial court attempted to make several *nunc pro tunc* findings. No matter what the court may have subjectively intended, the June 26, 2007, proceedings did not discharge wardship and the underlying DCFS guardianship. The court was not asked either before or at the hearing to terminate wardship and guardianship and the court's written order did not do so: "[f]ather's [p]etition for [i]mmediate [r]eturn of [c]hild is subsequently granted. DCFS is directed to return Aaron [R.] to the physical care of his parents." Further proceedings were held in the case, *i.e.*, a permanency hearing was scheduled and held October 2, 2007, and continued to December 4, 2007. This permanency review belies any intent on the part of the court to discharge guardianship and wardship and terminate the proceedings.

In attempting to terminate wardship and guardianship retroactively, the trial court was not correcting a clerical error but altering a judgment. It was not until March 13, 2008, when the court stated, for the first time, it was terminating the proceeding retroactive to June 26, 2007. The court stated it had intended to include an additional issue in its order of June 26, 2007, but the *nunc pro tunc* process is not for "shoring up" perceived defects. Months after that, on July 29, 2008, the court purported to add certain best-interest findings, also retroactive to June 26, 2007. In so doing, the court was not reconstructing findings made in June 2007 which had been misplaced from the record; rather, the court was making a statutory finding following an inquiry it did not make in June 2007 and for which there was no evidence it had intended to make in June 2007. The court's attempt to make the findings required by the Act retroactively, by entering its order *nunc pro tunc*, is an improper use of the *nunc pro tunc* procedure under the circumstances of this case.

In addition, the trial court's purported procedures undermined the Act's provisions for an orderly termination of proceedings based on contemporaneous findings. Contrary to the Act's requirements, the court's peremptory procedure never allowed DCFS to be heard concerning the reasons warranting continued court-supervised guardianship. "No legal custodian or guardian of the person may be removed without his consent until given notice and an opportunity to be heard by the court." 705 ILCS 405/2—28(4) (West Supp. 2007).

### C. Evidence Before the Trial Court Did Not Support Its Findings

A trial court's determination to terminate wardship is reviewed under the manifest-weight-of-the-evidence standard when the court's weighing of facts is at issue; otherwise, it is reviewed for abuse of discretion. See *In re M.K.*, 271 Ill. App. 3d 820, 831-32, 649 N.E.2d 74, 82 (1995).

In addition to the trial court's failure to comply with the requirements of the Act in terminating guardianship and its failed attempt to comply by issuing *nunc pro tunc* findings, we note the evidence before it did not support the findings it attempted to make retroactively.

Evidence presented at the June 26, 2007, hearing supported continuing wardship and guardianship. Although the trial court determined the State failed to prove Aaron was neglected for any of the reasons set forth in its supplemental petition, that did not provide a sufficient reason to go beyond the relief sought by the pleadings noticed for hearing, *i.e.*, to return Aaron to parental custody. The court should have considered whether the evidence supported continuing court supervision and oversight. The evidence the State presented supported a continuing need for wardship. Neither Monroe nor Tiffany presented any evidence at the hearing.

In April 2007, Aaron was hospitalized for medical and psychiatric treatment following episodes of violent behavior. Despite the fact they then had physical custody of Aaron, during his two-week hospitalization, neither Monroe nor Tiffany visited him or even contacted him, nor did they contact the hospital or his treating physician. Following Aaron's discharge, on his doctor's recommendation, Aaron went to live with the Atteberrys, where his behavior improved significantly, he gained weight, and seemed calmer. Aaron's marked improvement outside parental care, his parents' history of inconsistent care, and the fact Aaron had not been at home since his major hospitalization supported keeping court wardship.

Although the evidence did not show missed doctor's appointments, it showed Aaron obtained timely care for his ear infection *only* because the family's assigned homemaker intervened. Although the evidence

did not establish how a 28-day supply of Aaron's behavior medicine was used up in 14 days, the circumstances were irregular and indicated the parents needed help in administering medications. Although the evidence did not establish Aaron and his younger brother were harmed by the sex offender staying in their home, it showed poor judgment on the part of his parents, including leaving the boys alone with the offender. The trial court did express concern over the parents' poor judgment.

This evidence amply supported the continuation of court wardship and DCFS guardianship. While the trial court noted DCFS reports from 2005 and 2006 showed substantial progress toward return home and Aaron had actually been living with his parents prior to hospitalization, the court did not acknowledge later DCFS reports relating significant problems with parental custody. Even the earlier reports, while noting some progress, also noted the parents required continued DCFS assistance. Those reports recommended continuing court supervision with DCFS guardianship. Contrary to the court's assertion "problems that existed before had basically cleared up," the record revealed problems with Aaron's care consistently raising concerns and seemingly getting worse when the parents were actually put to the test of caring for him themselves.

Providing no clear description, the parents' attorneys represented to the trial court at or after the June 26, 2007, hearing that some type of plan had been made by which the parents would agree to receive DCFS services voluntarily. No such agreement appears of record and the record includes no enforceable order requiring the parents to continue to receive DCFS assistance. Further, it is not clear DCFS *could* provide services without a guardianship. Only court supervision, with DCFS guardianship, would assure the parents get the assistance from DCFS they still require. See *M.K.*, 271 Ill. App. 3d at 832, 649 N.E.2d at 82-83.

Thus, the evidence from the June 26, 2007, hearing (and after) does not portray a family capable of functioning independently to meet Aaron's needs. Instead, it shows a family in need of court supervision and DCFS guardianship to ensure Aaron is living in a stable, safe, and secure environment and his medical and physical needs are being met. The trial court's finding otherwise is against the manifest weight of the evidence and its purported discharge of DCFS guardianship and court wardship and termination of this case was an abuse of discretion.

## III. CONCLUSION

For the foregoing reasons, we reverse the trial court's judgment and remand the case for further proceedings.

Reversed and remanded.

McCULLOUGH, P.J., concurs.

JUSTICE STEIGMANN, specially concurring:

Although I agree with the majority in this case, I write separately to express my disapproval of how this child has been treated by the agencies of state government—specifically including the trial court, State's Attorney's office, and DCFS—who have been entrusted to protect children in this state. Starting with the unconscionable and unreasonable delay of almost two years between the filing of the State's neglect petition in March 2003 until January 2005, when the trial court finally conducted a hearing on that petition, the agencies charged with protecting children showed a patience in moving these proceedings along that bordered on disinterest. And, of course, it is the child who pays for this and other delays by the years he has been forced to live in what is, at best, the dysfunctional environment provided by his parents. Given that this child has special needs, the delays in this case are all the more intolerable.

This record strongly suggests that the State's Attorney's office years ago should have filed a petition to terminate the parental rights of both parents so that the ongoing charade of their "involvement" in this child's life could be ended and he could be placed in a real home. Regrettably, I note that a special concurrence I wrote 18 years ago about the delay of filing a petition to terminate parental rights largely applies to this case as well:

> "The evidence as reviewed by the majority demonstrates that the responsible authorities waited much too long for respondent 'to get her act together' before [the parental-termination] petition was filed. These children deserved better. Every child should have a stable, loving, secure, and *permanent* home. ***
> ***
> Trial courts must bear in mind that the formal order entered at the dispositional hearing (when the court finds the best interest of an abused or neglected child so requires) is to adjudicate the child a *ward of the court*. (See Ill. Rev. Stat. 1987, ch. 37, par. 802—22(1).) The statute does *not* say a 'ward of DCFS' or a 'ward of the State's Attorney.' Section 2—28 of the Act (Ill. Rev. Stat. 1987, ch. 37, par. 802—28) provides the mechanism for periodic review by

the *court* of the status of *its wards.* Part of the court's review always should be an inquiry as to whether its wards have permanent homes, and, if not, why not." (Emphases in original.) *In re A.T.,* 197 Ill. App. 3d 821, 835-36, 555 N.E.2d 402, 411-12 (1990) (Steigmann, J., specially concurring).

Over 17 years ago, in the seminal case of *In re L.L.S.,* 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991), this court discussed the standard of "reasonable progress" in the context of terminating parental rights and wrote the following:

" 'Reasonable progress' is an objective standard which exists when the court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such quality that the court, in the *near future,* will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child.

Judged by this standard, the glacial progress (being generous to even describe it as such) which the parents in the present case made to comply with the objectives of the service plan is not close to being sufficient. Looking at this record, and basing our conclusion upon what the evidence in fact *shows,* as opposed to idle hopes and musings of the respondents, we hold that no reasonable person could conclude that the respondents have made reasonable progress toward the return in the near future of their child to their custody. 'Measurable or demonstrable movement' cannot constitute 'reasonable progress,' as spoken of in section 1(D)(m) of the [Adoption] Act [(Ill. Rev. Stat. 1989, ch. 40, par. 1501(D)(m))], if it must be measured with a micrometer." (Emphases in original.)

The child in this case deserved better from the agencies which were supposed to protect him. I hope the result of my critical remarks will be to alert these agencies to their responsibilities.