NOTICE
Decision filed 03/17/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 241143-U

NOS. 5-24-1143, 5-24-1144 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

---

| | | |
|---|---|---|
| *In re* SAPPHIRE R. and BRISTOL R., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Clay County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 22-JA-4, 22-JA-5 |
| | ) | |
| Eva W., | ) | Honorable |
| | ) | Joel J.C. Powless, |
| Intervenor-Appellant). | ) | Judge, presiding. |

---

JUSTICE BOIE delivered the judgment of the court.
Justices Moore and Sholar concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court erred in failing to hold a proper hearing and to make the requisite statutory findings before ordering wardship and guardianship terminated and custody returned to minors' mother.

¶ 2   The intervenor, Eva W., was the foster mother of the minors, Sapphire R. and Bristol R.,[1] born January 2022 and November 2018,[2] respectively. The intervenor appeals the order of the trial court of Clay County entered on September 13, 2024, granting mother's[3] motion to close and

---

[1]The custody, guardianship, and wardship of Onyx R., the minor children's sibling, was also at issue in the trial court's proceedings. The intervenor was not the foster placement for O.R., and as such, the intervenor did not appeal the companion case of Onyx R. As such, we will only relate information concerning O.R. that is relevant to this appeal.

[2]Clay County case No. 22-JA-4 involved Bristol R., and case No. 22-JA-5 involved Sapphire R. On October 25, 2024, this court consolidated these two cases for purposes of appeal.

[3]The minors' natural father's rights are not at issue in this appeal. As such, we will only provide information pertaining to the father that is necessary to this appeal.

1

returning her minor children to her care *instanter*. Father's parental rights have not been terminated, and father is not a party to this appeal. For the following reasons, we reverse the judgment of the trial court and remand for further proceedings with directions.

¶ 3                                      I. BACKGROUND

¶ 4       On June 15, 2022, the State filed a petition for adjudication of wardship pursuant to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-1 *et seq*. (West 2022)), alleging that the minors, Sapphire R. and Bristol R., were neglected as defined in section 2-3(1)(b) of the Act (*id*. § 2-3(1)(b)), due to being in an injurious environment. Specifically, Bristol R., a three-year-old child, and Onyx R., a one-year-old child, eloped from the home and were discovered in the middle of a busy highway, on a day when temperatures reached 100 degrees, wearing no shoes, and only dirty diapers. Sapphire R. was four months old at the time and was discovered alone in the home. A shelter care hearing was held on June 15, 2022, in which the State proffered its anticipated evidence, and the parents agreed to the entry of a temporary custody order. The trial court ordered the minors placed in the temporary custody of the Illinois Department of Children and Family Services (DCFS). The minors were eventually placed into the intervenor's care, with Sapphire R. placed with the intervenor in November 2022 and Bristol R. in May 2023.

¶ 5       DCFS conducted an integrated assessment (IA) on July 26, 2022. The IA summarized prior indicated reports of neglect. The parents had been indicated for environmental neglect in 2021, when a hotline report was made after Bristol R. eloped from the home while father was sleeping. During the investigation, their home was found to be full of trash; had a strong odor; old food had been left out; and, roaches and other bugs had been observed. An intact family case was opened and closed successfully. A second indicated report arose from incidents that occurred on June 9, 2022. Onyx R. and Bristol R. were found 50 yards from their home, wearing only diapers and in a condition described as "filthy." Onyx R. had motor oil in his hair and Bristol R. had a cut on her

2

foot. Mother was at work and father was unable to be roused from sleep for 30 minutes, while four-month-old Sapphire R. screamed in the background. Both parents declined an offer from DCFS for intact services at the time of that incident. During the pendency of the investigation, a second hotline call was received five days later. The caller reported that Onyx R. and Bristol R. were again found walking down the middle of a two-lane highway, unsupervised. Onyx R. was carrying a razor blade and was bleeding from the head with cuts to his cheek and upper lip from that razor blade. The children were wearing only soiled diapers despite the temperature approaching 100 degrees Fahrenheit. The parents admitted they had been asleep when the children left the home, and the minors were taken into protective custody.

¶ 6    At the time the minors were brought into care, mother was a 24-year-old woman who had been in a relationship with father for five years. She graduated high school in 2017, was employed full-time, and often worked overtime while father watched the children. The IA screener noted concerns with mother's questionable judgment; mental health; possible intellectual limitations; poverty; emotional fatigue; and, stress within the home. Hands-on parenting courses were recommended to help teach mother how to keep a safe and clean home for her children. Her prognosis for reunification was guarded, and it was noted that her prognosis was closely tied to father's.

¶ 7    The initial service plan was completed June 22, 2022, and filed on September 9, 2022. The service plan indicated that mother was to (1) complete a mental health assessment and demonstrate a change in behavior; (2) complete parenting classes and demonstrate what was learned; (3) learn how to provide a safe, adequate, and clean housing arrangement for the minors, (4) maintain employment; and (5) complete random drug testing.

¶ 8    An adjudicatory order was entered on August 26, 2022. The parties stipulated to the facts supporting adjudication for neglect based on lack of supervision leading to an injurious

3

environment; and the trial court found that the minors were neglected, pursuant to section 2-3(1)(b) of the Act. 705 ILCS 405/2-3(1)(b) (West 2022). On September 9, 2022, a dispositional report was filed with the trial court. The report stated that both parents had been consistent with visits. Mother admitted to some difficulty in disciplining the children because she felt bad when they cried. DCFS indicated mental health services and parenting education and coaching were benefiting both parents. Further, if progress continued, DCFS intended to transition Bristol R. home to the parents within 90 days. On September 16, 2022, the trial court entered a dispositional order, finding mother unable, for reasons other than financial circumstances alone, to care for, protect, train, educate, supervise, or discipline the minors, and that it was in the best interests of the minors to be adjudged wards of the court. The minors were then placed in the custody and guardianship of DCFS.

¶ 9     On November 22, 2022, a status report from DCFS indicated that parents had tested negative for illegal drugs, had attended parenting classes, and were working with a parenting coach. The parenting coach observed mother to demonstrate basic parenting skills typically addressed in parenting classes. DCFS referred mother to the nurturing parenting program, which conducts parenting counseling in the home for one hour per week, but there was a waitlist. Mother had attended all scheduled visits and requested more visitation. Visits progressed to unsupervised in October 2022 and were reportedly going well. DCFS recommended Bristol R. begin the process of transitioning home and planned to place Bristol R. home by the end of November. On December 2, 2022, a status hearing was held and DCFS reported that Bristol R. had been transitioned home, with the goal of the other children returning home soon.

¶ 10     On April 4, 2023, a permanency report was filed with the trial court. Bristol R. had been placed in the parents' home on November 29, 2022, and Onyx R. had been placed in the parents' home on December 15, 2022. The report indicated that Sapphire R. had not been placed in the

4

home yet due to concerns over budgeting and housing. The parents' phones were shut off after Onyx R. was placed in the home and the parents were struggling financially.

¶ 11    In January 2023, police were called to the residence due to a verbal domestic dispute. Bristol R. disclosed that "daddy is mean to mommy" and "daddy yells." In March 2023, the parents received an eviction notice due to fighting and environmental hazards with concerns from housing that the home was "filthy" and had cockroaches. DCFS disagreed with housing authorities about the cleanliness of the home, describing the home as safe and consistent with minimal parenting standards.

¶ 12    On April 14, 2023, the first permanency hearing was held, and an agreed permanency order was entered. The permanency goal was return home within 12 months. The trial court found that mother had made substantial progress toward the goal and that the services contained in the service plan were appropriate and reasonably calculated to facilitate the achievement of the permanency goal.

¶ 13    On September 14, 2023, a psychological evaluation report was filed. The report indicated mother had intellectual deficits that would impair her ability to care for herself and to satisfy the typical demands of parenting. The report indicated that deficits in the areas of judgment, reasoning, and common sense would make parenting intervention and coaching necessary before she could parent without assistance and monitoring. The mother's history of neglect, the psychologist opined, was "likely a function of her cognitive limitations." The report recommended interventions to improve parenting outcomes, such as, (1) life skills training; (2) one-on-one in home parenting coaching; (3) after parenting coaching is completed, completion of a parenting capacity assessment; (4) mental health counseling; (5) memory games to improve memory and processing speed; and, (6) caseworker consultation with the intellectual/developmental disability coordinator, if necessary, for additional support and services for mother and her family.

¶ 14    On September 15, 2023, a permanency hearing was held, and the trial court was informed that mother was doing "fairly well" in her services but still struggled with housing stability and budgeting. The permanency order found that mother had made substantial progress, and the permanency goal remained return home within 12 months. The issues raised in mother's psychological report were not addressed at the hearing, although the trial court indicated that it had read the addendum.

¶ 15    A family service plan, dated December 11, 2023, was filed on February 26, 2024. The plan rated both parents as having unsatisfactory progress. The minors had been placed home; however, they had to be removed from placement with their parents when they became homeless on May 4, 2023, due to an eviction from housing. Thereafter, mother and father ceased to be in a relationship, and father stopped cooperating with DCFS. The service plan indicated that despite mother's full-time employment, she still had not secured housing for seven months, and her spending habits were a cause of concern. Mother spent money on cigarettes and eating out while remaining homeless with her children in care. Mother was staying with an aunt; however, the aunt's housing was not appropriate for visits with the minors. Mother was rated satisfactory on many tasks, including completion of services; however, she was rated unsatisfactory on demonstrating progress and benefit from treatment as evidenced by a change in behavior; identifying and creating a care plan for the children to ensure they would receive adequate supervision; identifying safe caregivers for the children; and issues related to her homelessness. DCFS described concern with mother's lack of demonstrated change, noted she had become more emotional, crying, and was unable to handle stressors. According to DCFS, mother appeared to be hiding information and became defensive when asked about her finances. Mother's mental health provider expressed concerns that mother had not been forthcoming in her sessions and had shown a decline in her mental health. The service plan rated mother's ability to demonstrate what she had learned in services during

6

interactions with her children as unsatisfactory. The plan indicated that during a visit on May 30, 2023, mother had to ask father to assist her in changing Sapphire R.'s diaper. Mother appeared to get overwhelmed while caring for her three children and had to ask father multiple times for assistance.

¶ 16    A permanency report was filed on February 26, 2024. It indicated that mother and father had separated, and mother was staying with her aunt. Mother had applied to two county's housing authorities; however, she was informed there was a long wait. Mother had saved $3,500 to help her when she does find appropriate housing. Mother continued with Spero Wrap-Around services monthly. Mother completed the nurturing parenting program through SPERO and was rated as satisfactory. Notably, the report indicated that the parent coaching service provider observed mother to demonstrate basic parenting skills typically addressed in parenting classes. Mother was exercising weekly supervised visits with all three children. There were no concerns raised as to the health and well-being of the minors.

¶ 17    The permanency report also noted an issue with mother's supervision of the minors at one of the visits. Mother allowed Sapphire R. to be out of her sight at the parking lot of the park. The report further indicated that DCFS was waiting on a psychological evaluation report from the psychologist; however, as noted above—it had been previously filed by DCFS with the court as an addendum in September 2023. The permanency report did not address the psychological report or its recommendations. Despite the unsatisfactory rating in the service plan on several issues, the permanency report indicated that the only barrier to reunification with mother was housing.

¶ 18    A permanency hearing was held March 1, 2024, and the State informed the trial court that the only issue remaining in the case was the mother obtaining housing. The permanency order, entered the same date, found that mother had made substantial progress, despite the unsatisfactory rating on the service plan. The trial court ordered that mother receive one overnight unsupervised

7

visit per week with the minors. The permanency goal remained return home within 12 months. There was no issue raised at the hearing regarding the service plan and the trial court found that the services contained in the service plan were appropriate and reasonably calculated to facilitate the achievement of the permanency goal and had been provided.

¶ 19    A status report was filed April 2, 2024. The report indicated that DCFS had concerns regarding mother's initiative in obtaining housing and with her spending habits. DCFS reported that mother had found a house to rent in March 2023, and that a list had been provided of landlords to call about housing. The report indicated that mother failed to report her efforts for obtaining housing and does not utilize the assistance offered. Mother also did not schedule an overnight visit when it was court ordered, and the same day that she could have exercised visitation, she instead posted a photograph of a new tattoo. Mother became upset and defensive when questioned about the visit not being scheduled. The following week, mother scheduled an unsupervised overnight visit, for which she reserved a room at a local motel, at her own expense, and additional unsupervised stays at the motel were scheduled. The overnight stays did not occur at mother's aunt's house due to mother's concerns about her aunt's living conditions.

¶ 20    On April 5, 2024, the trial court held a status hearing and discussed mother's progress in procuring appropriate housing. She informed the court that she had made an offer on a home, but it was not accepted. She advised the trial court that she would continue her search. On July 8, 2024, a status report was filed. The report indicated that mother made an offer on a house, but it was not accepted as it did not appraise for the loan amount. She had made an offer for $53,000 on another house, which was listed at $49,000. Mother was unable to explain the reason her offer was $4,000 asking. Mother's visitation schedule included one overnight visit per week with the children at a motel and one supervised visit. After the overnights, the report stated that the children were exhibiting significant behavioral problems. Sapphire R. would cry excessively, have screaming

fits, physical aggression, nontypical frustration, and nightmares. After one visit, Sapphire R. came home with several scratches on her buttocks and when asked, mother told DCFS she was unaware of any scratches or how they got there. Sapphire R. was also biting herself, leaving imprints of her teeth behind. Bristol R. also started biting herself after visits. Father's status had no change. A hearing was held July 12, 2024, in which the trial court was informed that mother had an offer accepted on a home with a closing date in August. The issues included in the status report were not addressed.

¶ 21     On July 31, 2024, mother filed a "Motion to Close," which cited no legal authority; but stated mother had made substantial progress toward the return home goal, completed her service plan, and purchased a home on July 25, 2024. The motion requested the trial court enter an order returning the minors home and closing the case.

¶ 22     On August 2, 2024, the trial court discussed the motion to close and a faxed petition to intervene as a foster parent from the intervenor's attorney, along with a motion to continue. During the hearing, the State and the guardian *ad litem* (GAL) favored return of custody and guardianship to the mother, with no aftercare services from DCFS. DCFS legal counsel discussed that no authority existed for a "Motion to Close" in a case in this posture, but if the motion was read as a motion to restore custody, an evidentiary hearing was required based on section 2-28(4) of the Act (705 ILCS 405/2-28(4) (West 2022)). An adjustment period after the children returned home was usually implemented, and DCFS stated that a hearing would be appropriate before returning the children home to discuss these options. Further, the house purchased by mother had not yet been inspected by the agency, as they learned that day that mother had purchased the house. The trial court ordered DCFS to inspect mother's new home within seven days, and, if found to be appropriate, to arrange unsupervised visitation with the minors in the home. Following the hearing,

9

the intervenor, the foster parent of Sapphire R. and Bristol R., filed a petition to intervene on August 5, 2024.

¶ 23    On September 10, 2024, a permanency report was filed. The report indicated that after the last hearing, mother had completed a parenting capacity assessment at the request of DCFS, with a report forthcoming. DCFS indicated concerns for the minor children's safety while in mother's care due to statements from her such as, "I just can't do this." DCFS reported mother's difficulties with getting the children to attend visits, often needing help from the foster parents to secure the children in her vehicle. Mother would become emotional or shift the blame when asked about her issues concerning the children or their behaviors. DCFS reported the home mother purchased contained smoke alarms and carbon monoxide detectors, as well as safety locks for the doorknobs. A local pastor was helping mother obtain furniture for the children's bedroom. The home passed a safety check and was appropriate for the family. Overnight visits continued in mother's new home. The minors had significant behavioral problems which escalated after overnight visits. Bristol R. was being referred for counseling to address the extreme behaviors; however, her siblings were too young for services. DCFS was awaiting the parenting capacity report and had concerns about mother's lack of childcare if the minors were to be returned to her custody.

¶ 24    On September 13, 2024, a hearing on mother's motion to close and the intervenor's motion to intervene was held. The trial court granted the intervenor's motion to intervene pursuant to section 1-5(2)(b) of the Act (705 ILCS 405/1-5(2)(b) (West 2022)). Next, the trial court proceeded to a hearing on the mother's motion to close. The parties agreed that the motion would proceed by argument. Mother argued that the only barrier to reunification was housing, which had been remedied by mother's purchase of a house appropriate for the minors to live in. Mother had completed the services prescribed by the service plan and had been rated as having made substantial progress at each permanency hearing. She further argued that the right to parent is one

10

of the most inalienable rights we have and hers had been denied by DCFS. She argued that the "children have been away from their mother for far too long and it's been no fault of [mother]."

¶ 25 The State argued that custody should be restored to the mother and the case closed, acknowledging that the permanency goal had always been to return home within 12 months. The only barrier to reunification had been housing since March 2024; and thus, the State questioned why DCFS requested a parenting capacity assessment in the final hour. Further, the State argued that it would be in the minors' best interest to return the children to their mother and close the case.

¶ 26 The GAL also argued for the children to return home and expressed his belief that the caseworker was biased against mother, attempting to drag the case out by requesting a parenting capacity assessment. The GAL believed that the caseworker "thinks that the foster parents are where these kids need to be." The GAL indicated that mother's house was deemed appropriate in August. He opined that the concerns listed in the latest permanency report about the minors' reactions to visitation with mother must have been reported to the caseworker from the foster parent, which the caseworker took "as gospel" and included in the report. The GAL did not indicate that there was evidence to contravene the reports from the foster parents or that he had personally observed custody handoffs between the foster parents and the mother; nor did he opine that it would be in Bristol R.'s best interests not to receive the counseling recommended by the agency. The GAL argued that the minors' best interests would be served by immediate reunification and closing the case without any visitation transition period or continued DCFS supervision, arguing, "we just need to rip the band-aid off."

¶ 27 Counsel for the intervenor argued that the latest DCFS report showed concerns with the children's behavior after completing unsupervised home visits. The intervenor argued that, given the issues the minors were having after visitation, the fact that the minors had previously been

11

placed and removed again, and concerns about the mother's ability to care for the minors on her own, a period of aftercare would be in the minors' best interests.

¶ 28    DCFS's legal counsel (DCFS legal) was present at the hearing and argued that the caseworker was not biased against the mother but had valid concerns about the minors' health and safety and mother's accountability. The minors had returned to their foster home with scrapes and mother had no explanation for how they got there, leading to a continuing concern regarding mother's supervision during the visit. Further, DCFS legal again raised concerns about the legal standard for a "motion to close case," which it argued was not contemplated in the Act. DCFS legal recommended that the trial court address the disposition, and whether it needed to be changed.

¶ 29    The intervenor attempted to share her concerns for the children but was interrupted by several parties. The trial court indicated that the parties had indicated that there would be argument only on the motion to close. Intervenor's counsel stated: "If we want to have a permanency hearing and put witnesses on, that's fine. We're here for permanency hearing." The trial court stated, "I guess I need to decide the motion to close first."

¶ 30    After some further discussion, the trial court allowed the intervenor to be heard. The intervenor stated that the minors displayed emotional disturbance and violent behaviors after overnight visits with mother, and the behaviors had not improved with additional visits. Bristol R.'s teacher had expressed concerns based on the changes in behavior. Sapphire R. had been pulling her hair out, biting, and hitting. The minors would get upset before and after visits and became violent, engaging in self-harming behaviors. Mother bribes the minors to leave with her because Sapphire R. hits, kicks, and screams because she does not want to go. The last few weeks have been better, but at times the transfer takes an hour. The intervenor indicated that she had discussed similar issues with the foster parent of Onyx R.

¶ 31    After hearing arguments, the trial court stated that the children were experiencing difficulty transitioning with visits and it could not determine why, but mother had made substantial progress at each permanency hearing. The trial court acknowledged that the case was opened in June 2022, and it was now September 2024. The trial court mused that any manner of transition home would be difficult, whether it be slow or all at once. The trial court stated that, "[t]he reality is they're losing who their mother is. They don't know you anymore. Let's just be honest. They just don't, and the longer that they are away from you, they're not going to know you." The trial court further stated as follows:

>    "What it really boils down to, you know, the interest of the parents. It's kind of like what [GAL] said, it's not the best place. It is best interest but it's not who is going to raise them better or what's the best place for them. I have kids and I promise you other people can definitely raise them way better than I can but they're my kids, I have those rights and those are—I can't think of any rights more powerful than being a parent as long as they're safe and you can take care of them. I mean, the interest of parents and their relationship with their children is sufficiently fundamental. We're talking about liberty interests that need to be protected by the 14th Amendment of the United States. It's a big deal. You've lost them for two years. What's interesting and what I'm hearing is that every permanency hearing you've shown substantial progress and you've done what everyone has asked you to do and the last thing you needed to do was get a house. I read the report. It said that the house is nice and it's acceptable. ***

>    Based on what I've heard today, the fact that you have housing and that you have done substantial progress at every permanency review hearing, I'm going to grant that motion and this case is closed. That is all."

13

¶ 32    The trial court entered a written "Order to Close" on September 13, 2024, which stated that mother had made substantial progress, had purchased a home, and the "Court find[s] that it is in the best interest of the minor children to return the children home to Respondent Mother and to terminate the proceedings." Prior to ordering the children returned to mother, the trial court failed to make written factual findings that the health, safety, and best interests of the minors and the public no longer required DCFS wardship prior to, effectively, terminating that wardship. The trial court also failed to hold a hearing or make any findings as to the fitness of mother before restoring custody and guardianship of the minors to her custody. The intervenor filed a timely notice of appeal on October 18, 2024, with a mail date of October 13, 2024.

¶ 33                                    II. ANALYSIS

¶ 34    On appeal, the intervenor argues that the trial court erred where it (1) applied the wrong standard in closing the case where it prioritized the rights of mother to parent over the best interests of the minors; (2) failed to comply with section 2-28(2) of the Act by failing to indicate, in writing, the reasons the goal was selected and why the preceding goals were deemed inappropriate and not in the minors' best interests; and (3) alternatively, that the trial court's order was against the manifest weight of the evidence.

¶ 35                    A. Failure to Comply with Section 2-31(2) of the Act

¶ 36    Whether the trial court failed to follow statutory requirements presents a question of law subject to *de novo* review. *In re Jamie P.*, 223 Ill. 2d 526, 532 (2006). In order to address the issue of whether the trial court complied with the requirements of the Act, we must first clarify the procedural posture of the case at the time of the hearing on mother's motion to close.

¶ 37    The motion to close failed to cite any authority, and the prayer for relief requested the trial court "enter an order closing this matter and return home the minor children." The hearing on September 13, 2024, began with the trial court allowing the foster mother to intervene. Next, the

14

trial court considered how the hearing would be conducted on the mother's motion to close. The intervenor's attorney indicated, "I think this is just an argument motion, not an evidentiary hearing." The trial court responded with, "Just argument. Okay. Let's go that route." No party objected and the attorneys were allowed to argue their positions regarding the appropriate dispositional order to be entered; and, the intervenor was allowed to briefly voice her concerns for the minors. The trial court did not take judicial notice of any documents and did not indicate that it considered any reports, such as the service plans, the permanency reports, or the psychological evaluation. The caseworker also did not testify.

¶ 38    Hearings conducted on petitions for change in custody are further dispositional hearings, which must be conducted in accordance with section 2-22(1) of the Act (705 ILCS 405/2-22(1) (West 2022)). *In re Austin W.*, 214 Ill. 2d 31, 44 (2005), *abrogated on other grounds by In re M.M.*, 2016 IL 119932. "[O]nce a child has been made a ward of the court and a dispositional order has been entered, the court may, at any time, vacate the original dispositional order and enter any other dispositional order that it could have entered under section 2-23(a) of the Act ***." *In re Austin W.*, 214 Ill. 2d at 44. We will reverse a trial court's dispositional determination only if the findings of fact are against the manifest weight of the evidence, or if the trial court committed an abuse of discretion by selecting an inappropriate dispositional order. *In re K.L.S.-P.*, 381 Ill. App. 3d 194, 195 (2008).

¶ 39    While the intervenor argues that the trial court failed to comply with section 2-28(2) of the Act by failing to indicate, in writing, the reasons the goal was selected and why the preceding goals were deemed inappropriate and not in the minor's best interests; the goal had always remained return home. Section 2-28(2) of the Act provides "[i]f the goal has been achieved, the court shall enter orders that are necessary to conform the minor's legal custody and status to those findings." 705 ILCS 405/2-28(2) (West 2022). Section 2-31(2) of the Act provides the authority for

terminating wardship, and thus, contains guidance for the orders necessary to conform the minor's legal custody and status to the required findings. *Id*. § 2-31(2). While mother's motion was not titled as such, it was essentially a motion to terminate wardship and guardianship and return custody to mother, a motion that should have been filed pursuant to section 2-31(2) of the Act.

¶ 40 A trial court may only terminate proceedings "[w]henever the court determines, and makes written factual findings, that health, safety, and the best interests of the minor and the public no longer require the wardship of the court." *Id*. If the court so determines, it shall order the wardship terminated and all proceedings under the Act with respect to the minor in question closed and discharged. *Id*.

¶ 41 In determining whether a minor should be restored to the custody of a parent, the single issue is the best interest of the child. *In re Ashley K.*, 212 Ill. App. 3d 849, 879 (1991). When considering a permanent placement, "[a] child's best interest is not part of an equation. It is not to be balanced against any other interest. *** [A] child's best interest is and must remain inviolate and impregnable from all other factors ***." *Id*. Among the appropriate matters to be considered are the nature and length of the child's relationship with the present caretaker and the effect that a change of placement would have upon the emotional and psychological well-being of the child. *In re Violetta B.*, 210 Ill. App. 3d 521, 534 (1991).

¶ 42 When considering the child's best interests, the trial court is required to consider, in the context of the child's age and developmental needs, the following:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

16

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2022).

¶ 43   Contrary to section 2-31(2), at the time of the September 13, 2024, hearing, the trial court failed to consider or find whether terminating the wardship, and consequently, terminating DCFS guardianship, would serve the "health, safety, and *** best interests of the minor and the public" (*id.* § 2-31(2)). The trial court did not enter orders specifically terminating the wardship or guardianship, although the outcome of case closure with no aftercare was effectively the same. The trial court found that case closure was in the minors' best interests; however, it did not consider whether terminating wardship and guardianship would serve the "health, safety, and *** best interests of the minor and the public," did not specifically order wardship and guardianship terminated, and failed to make written or oral findings regarding the same.

17

¶ 44    Additionally, before a guardianship is discharged as part of the termination of wardship, section 2-31(2) (*id.*) requires the trial court to comply with section 2-28(4) of the Act (*id.* § 2-28(4)). Section 2-28(4) of the Act provides "[c]ustody of the minor shall not be restored to any parent *** unless the minor can be cared for at home without endangering his or her health or safety and it is in the best interest of the minor." *Id.* Further, the trial court is precluded from returning a minor to the custody of a parent whose actions caused the minor to be adjudicated neglected until "a hearing is held on the issue of the health, safety, and best interest of the minor and the fitness of such parent *** to care for the minor and the court enters an order that such parent *** is fit to care for the minor." *Id.*; *In re Aaron R.*, 387 Ill. App. 3d 1130, 1139 (2009). Section 2-28(4) of the Act also requires the trial court, when restoring custody to the parent, to order the parent to comply with the terms of an aftercare plan or risk the loss of custody of the child and possible termination of their parental rights. 705 ILCS 405/2-28(4) (West 2022).

¶ 45    The proceedings of September 13, 2024, did not satisfy these statutory requirements. The trial court failed to make written factual findings that the health, safety, and the best interests of the minor and the public no longer required the wardship of the court. The trial court did not mention or provide any written findings on any of the best interests factors. Further, because the minors had been found to be neglected, based on circumstances created by mother and father, the trial court was required to enter an order finding mother fit to care for the minors before custody was restored. The trial court, however, failed to hold an evidentiary hearing, order an investigation, or make the necessary finding that mother was fit to care for the minors. The trial court also failed to ensure that DCFS aftercare was provided after a return of custody to the parent that created the circumstances surrounding the neglect. The effectual discharge of the case was done without complying with the Act's requirements and, thus, it is ineffectual.

¶ 46 It is clear that the parties to the hearing were confused as to the basis in law and procedure to terminate guardianship and restore custody of the minors to mother. DCFS legal repeatedly expressed confusion about the legal basis for a "motion to close." Counsel for the intervenor called the hearing a permanency hearing, then later argued he would like the trial court to conduct a permanency hearing, and the parties and the court expressed their belief that a ruling was required on the "motion to close" prior to conducting a permanency hearing. The parties proceeded by "argument only," despite section 2-22(1) of the Act allowing "[a]ll evidence helpful in determining these questions [regarding the appropriate disposition], including oral and written reports, may be admitted and may be relied upon to the extent of its probative value, even though not competent for the purposes of the adjudicatory hearing." *Id.* § 2-22(1).

¶ 47                                      III. CONCLUSION

¶ 48 For the reasons we have discussed, we hold that the trial court's written and oral statements failed to satisfy the requirements of the Act, where the trial court did not make the requisite findings of fact. Thus, the trial court's dispositional order restoring custody to mother and terminating the guardianship and wardship was ineffectual and must be reversed. Further, the evidence before the trial court at the hearing was insufficient to make such findings, where the hearing proceeded by argument, there was no testimony, and the trial court considered no documentary evidence. The trial court's order of September 13, 2024, terminating the proceedings and returning the minors to mother is reversed, and the cause is remanded to the trial court for further proceedings that comply with the requirements of the Act as set forth above.

¶ 49 Reversed and remanded with directions.

19